Taft, J.
 

 The first question raised is whether the Director of Highways had authority to make the contact involved.
 

 We believe that question may have been decided in
 
 State, ex rel. Kauer, Dir.,
 
 v.
 
 Defenbacher, Dir.,
 
 153 Ohio St., 268, 91 N. E. (2d), 512, where this court issued a writ of mandamus compelling issuance of a certificate of encumbrance certifying to the availability for expenditure by the Director of Highways of the sum of $100,000 for highway department “engineering and other forces including salaries and other operating expenses” and the sum of $500,000 for “consulting-engineers and traffic engineers.” The Auditor of State was a party to that action and opposed the issuance of that writ.
 

 However, in view of the importance of the question and since some of the arguments now made by the auditor in support of his contention on that question were not made in that case although they could have been made then, we will consider those arguments as though the question had not been previously decided.
 

 In
 
 State, ex rel. Alden E. Stilson & Associates, Ltd.,
 
 v.
 
 Ferguson, Aud.,
 
 154 Ohio St., 139, 93 N. E. (2d), 688, this court did hold that the Director of Highways had no authority, independent of the turnpike act, to employ a firm of professional engineers. In that case, the only question involved was whether the Director of Highways was authorized to enter into a contract with a firm of professional engineers by the words in
 
 *30
 
 Section 1178-17, General Code, authorizing him to “employ such
 
 assistants
 
 as are necessary to prepare plans and surveys.” (Emphasis added.)
 

 Section 1220, General Code, which is a part of the turnpike act, reads:
 

 " With the approval and the consent of the controlling board, the Director of Highways shall expend out of any funds available for the purpose such moneys as may be necessary for the study of any turnpike project or projects and
 
 to use its engineering and other forces, including consulting engineers and traffic engineers,
 
 for the purpose of effecting such study, and all such expenses incurred by the Director of Highways prior to the issuance of turnpike revenue bonds under the provisions of this act, shall be paid by the director and charged to the appropriate turnpike project or projects, and the director shall keep proper records and accounts showing each amount so charged. Upon the sale of turnpike revenue bonds for any turnpike project or projects, the funds so expended by the Director of Highways with the approval of the commission in connection with such project or projects shall be reimbursed to the department from the proceeds of such bonds.” (Emphasis added.)
 

 Relators argue that the emphasized language in the foregoing section authorizes the director to use the engineering forces of the highway department and to use other forces including consulting engineers and traffic engineers. On the other hand, the auditor argues that the word “its” (meaning the highway department’s) modifies both the word 4‘engineering” and the word “other.” The difficulty with this latter interpretation is that it results in giving no meaning to the words “including consulting engineers and traffic engineers.” If, by “consulting engineers and traffic engineers,” the General Assembly intended to designate only employees of the highway department,
 
 *31
 
 it could have accomplished the same purpose without the use of such words, because such employees would have been covered by the words “engineering and other forces.”
 

 Furthermore, the 98th General Assembly which enacted Section 1220, General Code (effective September 1, 1949), also enacted Section 486-7a, General Code (effective July 28, 1949). The latter section pertains to positions, offices and employments in the state service and classifies them. Subparagraph VII of that section, which pertains to engineering and applied sciences, classifies the various engineers employed in the state service. Nowhere in that section is reference made to either consulting or traffic engineers. Since the General Assembly did not make provision in Section
 
 486-7a
 
 for the regular employment in the state service of consulting or traffic engineers, it is not reasonable to interpret the words “consulting and traffic engineers” in Section 1220, General Code, as including any engineers regularly employed in the highway department.
 

 The auditor argues further that Section 1220, General Code, does not specifically authorize the Director of Highways to enter into a written contract with a firm of consulting engineers or a firm of traffic engineers. However, as we have pointed out, it does authorize the Director of Highways to use consulting engineers and traffic engineers, and provides for the expenditure of funds necessary for the study of a turnpike project, that “all such expenses incurred by the Director of Highways” are to be paid by the director and that he is to keep proper records and accounts showing the turnpike project or projects against which they are to be charged. Where an officer is authorized to use the services of others and to pay the expenses incurred in using their services, it would
 
 *32
 
 seem obvious that authority to make some contract for their services will necessarily be implied.
 

 Thus, by using the words which were used in Section 1220, General Code, the General Assembly contemplated that the Director of Highways was to have authority to use consulting engineers and traffic engineers as those terms are generally understood; that such engineers could be used even though not regular employees of the director; that such use of such engineers by the director would require contracts for their employment such as the one involved in the instant case; and that the director was to have authority to make such contracts. The contract here involved clearly is related to the study of a turnpike project.
 

 The auditor argues further that there can be no “study of any turnpike project,” within the meaning of Section 1220, General Code, until the project has at least been located. In support of this contention, the auditor relies upon Section 1204 (b), General Code, defining the word “project” and the words “turnpike project” to “mean any express highway * '* * constructed under the provisions of this act, at such locations as shall be approved * * *.” We believe that the contention of the auditor in this respect would result in an unreasonable interpretation of the words “study of any turnpike project or projects” found in Section 1220, General Code. As so construed, a study of a project would only be authorized either after it was completed or at a time when the study would be of only academic interest. The obvious purpose of Section 1220, General Code, was to enable the commission to secure the necessary infonnation and data that it would require before locating the turnpike. As we indicated in
 
 State, ex rel. Kauer, Dir.,
 
 v.
 
 Defenbacher, Dir., supra,
 
 274, such a study of a turnpike project, within the meaning of Section 1220, General Code, was
 
 *33
 
 something which might necessarily take place prior to the location of the turnpike project.
 

 The next question raised by the auditor is whether the turnpike commission exists in Ohio.
 

 The 98th Genera] Assembly, which enacted the turnpike act, adjourned sine die on July 29, 1949. No special sessions of that assembly were called or held. The turnpike act did not become effective until September 1, 1949, and appointments to the commission were not made until September 8,1949.
 

 Section 12, General Code, reads:
 

 “When a vacancy in an office filled by appointment of the Governor, with the advice and consent of the Senate, occurs by expiration of term
 
 or otherwise
 
 during a session of the Senate, the Governor shall appoint a person to fill such vacancy and forthwith report such appointment to the Senate. If such vacancy occurs when the Senate is not in session, and no appointment has been made and confirmed in anticipation of such vacancy, the Governor shall fill the vacancy and report the appointment to the next session of the Senate, and, if the Senate advise and consent thereto, such appointee shall hold the office for the full term, otherwise a new appointment shall be made.”
 

 In our opinion, upon the effective date of the turnpike act, vacancies occurred on the commission created by that act and the Governor then had the right to fill those vacancies pursuant to the provisions of Section 12, General Code. See 42 American Jurisprudence, 978, Section 134. While the appointments of the Governor must be submitted to the Senate of the 99th General Assembly for confirmation, and appointees whom it fails or refuses to confirm may not continue as members of the commission, the interim appointees have power and authority in the meantime to act as a turnpike commission.
 

 
 *34
 
 The next question raised is whether it is unlawful for the Director of Highways to expend, in the form of a loan, advancement or otherwise, any highway funds in reference to the study, location or construction of a toll turnpike project. This question was specifically answered by paragraphs five, six and nine of the syllabus in
 
 State, ex rel. Kauer, Dir.,
 
 v.
 
 Defenbacher, Dir., supra.
 

 Other questions have been raised in support of the contention that the writ of mandamus should not be allowed in the instant case. These questions relate largely to the validity of portions of the turnpike act other than Section 1220, General Code.
 

 Ordinarily, where a proceeding directly involves only one section of an act, it is not necessary to consider questions raised as to the constitutionality of other provisions of the act. Where, however, it appears improbable and unreasonable that the General Assembly would have enacted the section directly involved if the General Assembly knew that those other provisions of the act were unconstitutional, it is necessary, if the question is raised, to consider the constitutionality of those other provisions in order to determine the validity of the particular section so involved.
 
 State, ex rel. Kauer, Dir.,
 
 v.
 
 Defenbacher, Dir., supra,
 
 283;
 
 State, ex rel. Huston,
 
 v.
 
 Commrs. of Perry County,
 
 5 Ohio St., 497;
 
 State
 
 v.
 
 Pugh,
 
 43 Ohio St., 98, 1 N. E., 439;
 
 State
 
 v.
 
 Sinks,
 
 42 Ohio St., 345;
 
 State, ex rel. Atty. Genl.,
 
 v.
 
 Kinney, Secy. of State,
 
 56 Ohio St., 721, 47 N. E., 569. See, also, 8 Ohio Jurisprudence, 200, Section 98.
 

 If the General Assembly had known that provisions of the turnpike act were unconstitutional to such an extent that no turnpike could he built thereunder, it would clearly have been improbable and unreasonable that the General Assembly would have enacted Section 1220, General Code, authorizing the expenditure of
 
 *35
 
 very substantial sums of money for the study of such a turnpike project. The soundness of this conclusion is demonstrated-by the specific provision made by the General Assembly in Section 1220, General Code, for the reimbursement of funds expended by the Director of Highways from the proceeds of turnpike revenue bonds. If no such bonds can legally be issued under the turnpike act, there can be no such reimbursement. Obviously, there can be no proceeds from such bonds if a turnpike cannot be constructed by the commission. Therefore, where a question is raised by the auditor as to the constitutional validity of some other part of the turnpike act and it appears that a decision in favor of the auditor on such question would make it impossible to construct a turnpike, that question must be considered in determining the validity of Section 1220, General Code.
 

 The auditor contends that the turnpike act is unconstitutional because it purports to authorize the appropriation of private property for the construction of roads or turnpikes upon which tolls are to be charged in violation of Section 19 of Article I of the Constitution.
 

 Obviously, if this authority to appropriate property cannot be exercised, it will be virtually impossible to construct a turnpike. Furthermore, if tolls cannot be charged on the turnpike, there will be no revenue available to pay interest on, or retire, the bonds which must be issued in order to finance construction of a turnpike. Therefore, it is necessary to answer this contention of the auditor before sustaining the validity of Section 1220, General Code.
 

 Section 19 of Article I of the Constitution of Ohio reads:
 

 “Private property shall ever be held inviolate but subservient to the public welfare. When taken in time of war or other public exigency, imperatively re
 
 *36
 
 quiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money: and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner. ’ ’
 

 It is argued that the words in this section, “roads, which shall be open to the public, without charge,” prevent the exercise by or on behalf of the state of the power of eminent domain in the acquisition of property for roads which will not be open to the public without charge.
 

 In the construction of this section of the Constitution, it should be remembered that it represents a limitation on the power of the General Assembly to legislate rather than a delegation of power to the General Assembly. See
 
 Giesy
 
 v.
 
 Cincinnati, Wilmington & Zanesville Rd. Co.,
 
 4 Ohio St., 308;
 
 Baker
 
 v.
 
 City of Cincinnati,
 
 11 Ohio St., 534, 542, 543;
 
 Pohl
 
 v.
 
 State,
 
 102 Ohio St., 474, 132 N. E., 20.
 

 The section contemplates that in certain specific instances private property may be taken. These instances are “in time of war or other public exigency, imperatively requiring its immediate seizure” and “for the purpose of making or repairing roads, which shall be open to the public, without charge.” In such instances, it is provided merely that ‘ ‘ compensation shall be made to the owner, in money.” The section then goes on to provide that “in all other cases, where private property shall be taken for public use, a compensation therefor shall first be' made in money, or first secured by a deposit of money * *
 
 Waid, Dir.,
 
 v.
 
 Heistand,
 
 122 Ohio St., 615, 174 N. E., 139, recognizes that the provision, with regard to tak
 
 *37
 
 ing in time of war or other public exigency or for making or repairing free roads, is separate from the provision with regard to “all other cases” where compensation must first be made in money or first secured by a deposit of money.
 

 Admittedly, the turnpike projects contemplated by the turnpike act would not be “roads, which shall be open to the public, without charge.” For that reason, there could be no taking of private property for such a project as in
 
 Waid, Dir.,
 
 v.
 
 Heistand, supra,
 
 where compensation was not first made in, or secured by a deposit of, money. However, the taking of private property for the construction of a toll road would come within the words “in all other cases.”
 

 In our opinion, the provision with respect to roads open to the public without, charge, found in Section 19 of Article I of the Constitution, is applicable only to the situation where private property is appropriated without first making compensation to the' owner; and this section of the Constitution does not limit the power of the General Assembly to provide for the exercise of the right of eminent domain by the taking of private property for the purpose of making or repairing toll roads, except that, in such an instance, provision must be made for compensation to the owner before the taking. This has been made by the Ohio Turnpike Act. Section 1208, General Code.
 

 Certain objections have been raised by the auditor which, if sound, would prevent the issuance or sale of
 
 any
 
 revenue bonds under the turnpike act.
 

 The question is raised as to whether the act authorizes the turnpike commission to incur obligations which will be debts or liabilities of the state.
 

 Section I of Article VIII of the Constitution- provides that the state may contract certain debts but that their aggregate shall never exceed $750,000. Section 2 of such article provides tha,t, in addition, the
 
 *38
 
 state may contract debts to repel invasion, suppress insurrection, defend the state in war, or redeem outstanding indebtedness. Section 3 of the same article provides: ‘ ‘ Except the debts above specified in sections one and two of this article, no debt whatever shall hereafter be created by or on behalf of the state.”
 

 Section 6 of Article XII of the Constitution limits the power of the state to contract any debts for the purposes of internal improvement.
 

 Wherever reference is made in the turnpike act to the issuance of turnpike bonds, it is stated specifically that such bonds shall be payable solely from revenues derived from the turnpike project concerned. It is also specifically provided in several instances that such bonds ‘ ‘ shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision.” Words to this effect are required to be placed on the face of all turnpike bonds issued under the act. (Section 1202, General Code.)
 

 In Ohio it is well settled that such bonds do not constitute a “debt” within the meaning of the constitutional provisions hereinbefore referred to
 
 Kasch
 
 v.
 
 Miller, Supt.,
 
 104 Ohio St., 281, 135 N. E., 813;
 
 State, ex rel. Public Institutional Bldg. Authority,
 
 v.
 
 Griffith, Secy. of State,
 
 135 Ohio St., 604, 22 N. E. (2d), 200;
 
 State, ex rel. State Bridge Comm.,
 
 v.
 
 Griffith, Secy. of State,
 
 136 Ohio St., 334, 25 N. E. (2d), 847. See, also, the similar holdings in
 
 New Jersey Turnpike Authority
 
 v.
 
 Parsons, Atty. Genl.,
 
 3 N. J., 235, 69 A. (2d), 875, and
 
 Application of Oklahoma Turnpike Authority,
 
 221 P. (2d), 795.
 

 It, may be observed that, under the turnpike act, the revenues, which are to be the source of money for payment of the bonds, are not revenues from payments by the state as in the case of
 
 State, ex rel. Public Institutional Bldg. Authority,
 
 v.
 
 Griffith, Secy. of State,
 
 
 *39
 

 supra,
 
 and
 
 State, ex rel. Public Institutional Bldg. Authority, v. Neffner, Secy. of State,
 
 137 Ohio St., 390, 30 N. E. (2d), 705, where this court held that revenue bonds, payable from such revenues, were, in effect, debts of the state.
 

 The auditor argues that, under the turnpike act, the commission could issue revenue bonds for the construction of a turnpike project, pledge the revenues to be received for the payment of those bonds until they are half paid, then issue additional bonds for the construction of an extension to the project, and pledge the revenues of both the original project and the extension for payment of the additional bonds. It is then pointed out that, if the extension fails to produce sufficient revenue, the provisions of the turnpike act would authorize the payment of the bonds issued for the extension from revenue derived from the original project. It is argued that, in effect, this would be contrary to the holding of this court in
 
 State, ex rel. Public Institutional Bldg. Authority,
 
 v.
 
 Griffith, Secy. of State, supra.
 

 We do not express any opinion on the problem, as to whether revenues derived from a project and its extension may lawfully be used to make payments on bonds issued to pay for the extension, where revenues derived from the extension alone are insufficient to make such payments. That problem is not before us now.
 

 The next question raised is whether there are reasons, other than those considered in
 
 State, ex rel. Kauer, Dir.,
 
 v.
 
 Defenbacher, Dir., supra,
 
 as to why the Ohio turnpike act contravenes the provisions of Section 4 of Article VIII of the Constitution. That section reads in part:
 

 “The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual association or corporation whatever * * V’
 

 
 *40
 
 It is argued that title to property acquired by the commission for the purpose of constructing a turnpike is in the state, and that, by permitting the use of that property of the state to raise revenues to be used in paying off the bonds, the General Assembly has, in effect, said to the holders of turnpike revenue bonds: “We guarantee you the use of state lands for the purpose of producing income from which you may be repaid the amount of your principal invested in these- bonds plus the interest on your investment.” There is much force to this argument. However, this court has repeatedly held that similar legislation does not involve a gift or loan of the credit of the state, within the meaning of Section 4 of Article VIII of the Constitution.
 
 Kasch
 
 v.
 
 Miller, Supt., supra; State, ex rel. State Bridge Comm.,
 
 v.
 
 Griffith, Secy. of State, supra.
 
 See, also,
 
 State, ex rel. Public Institutional Bldg. Authority,
 
 v.
 
 Griffith, Secy. of State, supra.
 

 The facts in the instant case are different from those involved in
 
 State, ex rel. Public Institutional Bldg. Authority,
 
 v.
 
 Griffith, Secy. of State, supra.
 
 Here the revenues, which are to be the source of funds for payment of bonds of the commission, are tolls to be collected from members of the public for use of the highway. If, in this case, the only user of a turnpike would be the state, then an agreement by the state to use and pay for the use would, in effect, create a debt of the state even if the bonds were payable only out of revenues received for that use. That, in effect, was the situation in
 
 State, ex rel. Public Institutional Bldg. Authority,
 
 v.
 
 Griffith, Secy. of State, supra.
 

 That case also involved a pledge of revenues to be received, not merely from property being acquired for the state, but also from revenue producing property owned by the state before such acquisition. Substantially the same situation existed in
 
 Village of Brewster
 
 v.
 
 Hill,
 
 128 Ohio St., 343, 190 N. E., 766. See, also,
 
 *41
 

 State, ex rel. Campbell, Pros. Atty., v. Cincinnati St. Ry. Co.,
 
 97 Ohio St., 283, 119 N. E., 735. In the instant case, the revenues to be used to pay the bonds are revenues which will be obtained only from property acquired with amounts received from sale of those bonds.
 

 It is argued further that the act gives the commission, subject to the approval of the Governor, the consent of the state to use property now owned by the state which is necessary or proper for the construction or operation of any turnpike project. It should be noted, however, that, in such an instance, the commission is required to make adequate compensation to the state for such use. Cf.
 
 Chagrin Falls & Cleveland Plank Road Co.
 
 v.
 
 Cane,
 
 2 Ohio St., 419.
 

 It is argued that the turnpike act contains no standard for determination of the tolls to be levied by the commission. We believe that this question was settled contrary to the contention of the auditor by the decision of this court in
 
 State, ex rel. State Bridge Comm.,
 
 v.
 
 Griffith, Secy. of State, supra,
 
 which held that the act providing for .the State Bridge Commission was constitutional. See, also,
 
 Chagrin Falls & Cleveland Plank Road Co.
 
 v.
 
 Cane, supra,
 
 at 427. If may be observed that the provisions (Section 1084-13, General Code) for fixing tolls contained in the Bridge Commission Act are substantially similar to those (Section 1214, General Code) contained in the turnpike act.
 

 It is contended by the auditor that the broad powers to act and authorize others to act, conferred upon the commission, are invalid as a delegation of legislative power. Without considering whether any particular power or the exercise of it may or may not be valid, it is obvious that, if the commission cannot exercise the broad powers conferred on it by the turnpike act merely because the powers so conferred represent a
 
 *42
 
 delegation of legislative power, it will be helpless to act and will not be able to construct a turnpike.
 

 The position of the auditor is that the grant of these powers to the turnpike commission represents a delegation of legislative power for the reason that the General Assembly has failed to prescribe any adequate limitations to control the exercise of those powers.
 

 By general laws, the General Assembly can provide for the incorporation of private companies and confer upon them power to construct, maintain and operate public projects, such as railroads, turnpikes and canals, at' such locations as they may specify in their articles of incorporation,
 
 i. e.,
 
 at such locations as the incorporators, in their discretion, may determine.
 
 Toledo & Wabash Ry. Co.
 
 v.
 
 Daniels,
 
 16 Ohio St., 390. By general laws, the General Assembly can confer upon such a private company, to the extent necessary for construction, maintenance and operation of such a public project, the power to acquire and hold property, to incur expenses, to borrow money, to issue bonds, to mortgage its property as security for the bonds, to pledge its revenues as security for such bonds, to enter into trust agreements providing security for the payment of such bonds, to make contracts, to adopt bylaws, to hire employees, to fix their compensation, to maintain offices, and to fix tolls, charges or other fares. It would hardly be contended that, by conferring such powers on private corporations, the General Assembly delegated its legislative power to those private corporations. Sometimes the General Assembly limits these powers and sometimes the only limitation on them is that to be implied from the purposes for which the General Assembly authorized the creation of such a corporate enterprise. The General Assembly may otherwise regulate or limit the exercise of such powers when it grants them bul it is not required to do so.
 

 
 *43
 
 It would seem to follow that the General Assembly may confer similar broad discretionary powers on a public commission to enable it to accomplish purposes which the state may undertake. Of course, the stale may not, as may a private individual or corporation, embark on an enterprise of a purely private character. However, a turnpike project is obviously an enterprise of a public character.
 
 Cincinnati, Wilmington & Zanesville Rd. Co.
 
 v.
 
 Commrs. of Clinton County,
 
 1 Ohio St., 77;
 
 Young v. Buckingham,
 
 5 Ohio, 485.
 

 The soundness of these conclusions is clearly demonstrated in the opinion of the court by Ranney, J., in the
 
 Commrs. of Clinton County case,
 
 at pages 87 to 101. We believe that his reasoning there justifies the following conclusions:
 

 I. Legislation may be divided into two general classifications:
 

 1. “Laws which imperatively command or prohibit the performance of acts.”
 

 2. Laws “which only authorize or permit” the performance of acts.
 

 II. As to the latter classification of laws, no delegation of legislative power is involved merely because broad discretion is conferred on a party, who is given authority, to determine whether or how that authority shall be exercised. The General Assembly may grant to one of its agencies, or even a private corporation, power to take or authorize others to take whatever action it deems necessary to accomplish a jjurpose which the state itself would have authority to accomplish. In such an instance, it is not necessary, in order to avoid a delegation of legislative power, for the General Assembly to specify or define the particular action which may be taken or authorized or to limit such power in any way, other than by relating it to such a purpose.
 

 
 *44
 
 See, also,
 
 City of Akron
 
 v.
 
 Dobson,
 
 81 Ohio St., 66, 90 N. E., 123.
 

 As pointed out in the opinion by Ranney, J., in
 
 Giesy
 
 v.
 
 Cincinnati, Wilmington & Zanesville Rd. Co., supra,
 
 at 328, even though the limits of such authority are indefinite, the courts have the power to prevent abuses, which may arise in the use of such authority for purposes other than attainment of the lawful purposes for which it was granted.
 

 In particular, the auditor contends that Sections 1205 and 1217, General Code, involve a delegation of legislative power. These portions of the turnpike act purport to grant the commission power to police the turnpike and to make rules and regulations for use and protection of the turnpike and provide that violations of those rules and regulations shall be misdemeanors punishable by fine. It is argued that a delegation of legislative power is involved in these provisions because no standards are established to guide the commission. These portions of the turnpike act present a different problem from that presented by those portions which merely authorize or permit the performance of acts.- We do not express any opinion as to whether they involve a delegation of legislative power. Cf.
 
 Strain, Dir., Trustee,
 
 v.
 
 Southerton,
 
 148 Ohio St., 153, 74 N. E. (2d), 69;
 
 Matz, Admr.,
 
 v.
 
 J. L. Curtis Cartage Co.,
 
 132 Ohio St., 271, 7 N. E. (2d), 220;
 
 Coady
 
 v.
 
 Leonard et al., Board of Liquor Control,
 
 132 Ohio St., 329, 7 N. E. (2d), 649. We do not believe that that question is before the court at this time. Even if such provisions are invalid, the General Assembly could readily enact statutory provisions covering the use and protection of turnpike projects. Even if these provisions are invalid, their invalidity should not be any substantial obstacle to the construction of turnpikes under the turnpike act. It does not appear to be either improbable or unreasonable that the General
 
 *45
 
 Assembly would have enacted other portions of the turnpike act, including Section 1220, General Code, even if it knew that these portions of the act were invalid. If these portions of the act are stricken out, those which remain are complete in themselves and capable of being executed in accordance with the apparent legislative intent wholly independent of the portions of the act so stricken. It follows that, even if these portions of the act are unconstitutional, the remaining portions must be sustained.
 
 Treasurer of Fayette County
 
 v.
 
 People’s & Drover’s Bank,
 
 47 Ohio St., 503, 25 N. E., 697, 10 L. R. A., 196;
 
 State, ex rel. Greenward Realty Co.,
 
 v.
 
 Zangerle, Aud.,
 
 135 Ohio St., 533, 21 N. E. (2d), 662;
 
 Gager, Treas.,
 
 v.
 
 Prout,
 
 48 Ohio St., 89, 26 N. E., 1013;
 
 Geiger
 
 v.
 
 Geiger,
 
 117 Ohio St., 451, 160 N. E., 28;
 
 Bowles
 
 v.
 
 State,
 
 37 Ohio St., 35, 44.
 

 Demurrer to amended anstver sustained and writ
 
 allowed.
 

 Zimmerman, Middleton and Hart, JJ., concur.
 

 Weygandt, C. J., concurs in the judgment and in the first three paragraphs of the syllabus which are decisive of the issues here involved.
 

 Stewart, J., concurs in the judgment, and in the syllabus except paragraph four.
 

 Matthias, J., concurs only in paragraphs two, three and four of the syllabus, and dissents from the judgment for the reasons stated in
 
 State, ex rel. Kauer, Dir.,
 
 v.
 
 Defenbacher, Dir.,
 
 153 Ohio St., 268, 285, 91 N. E. (2d), 512.