THE STATE, EX REL. OHIO FUNDS MANAGEMENT BOARD, *v.*
WALKER, DIRECTOR OF BUDGET AND MANAGEMENT.

[Cite as State, ex rel. Ohio Funds Mgt. Bd., *v.* Walker (1990),
55 Ohio St. 3d 1.]

(No. 88-2209—Submitted June 6, 1990—Decided October 24, 1990.)

1

2

---

[1] The agreed statement of facts shows that the state did not experience any cash flow deficiency in the General Revenue Fund for the fiscal years 1985 and 1986, and no draw on the Total Operating Fund was required. The state did encounter an expected cash flow deficiency in the General Revenue Fund in December 1987 and it was necessary to draw upon $176,000,000 from the Total Operating Fund. A cash flow deficiency in the General Revenue Fund occurred in five months in fiscal year 1988, with the highest draw upon the Total Operating Fund being $289,000,000 in December 1987. The maximum permitted draw under the seven-percent limit imposed by statute was $744,600,000.

---

[2] One of the major arguments in support of the legislation is that from time to time surpluses in various funds are invested by the Treasurer as authorized by law. Relator argues that if the Treasurer must liquidate these investments before maturity to control cash flow deficiencies, the state will suffer substantial penalties for early withdrawals. Further, relator argues that if the Treasurer can solve casual cash shortfall with short-time obligations for which revenues have already been appropriated within the fiscal period, the state will benefit from such fiscal management.

*Peck, Shaffer & Williams, John M. Anderson* and *John Weld Peck,* for relator.

*Anthony J. Celebrezze, Jr.,* attorney general, *Loren L. Braverman* and *Cherry Lynne Poteet,* for respondent.

*Porter, Wright, Morris & Arthur, Ronald W. Gabriel* and *Kathy S. Northern,* urging denial of the writ for *amicus curiae,* Ohio Chamber of Commerce.

HOLMES, J. The sections of the Ohio Constitution involved here are Sections 1 and 3 of Article VIII.[3]

Section 1 of Article VIII provides:

"The state may contract debts, to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the general assembly, or at different periods of time, shall never exceed seven hundred and fifty thousand dollars; and the money, arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever."

Section 3 of Article VIII provides:

"Except the debts above specified in sections one and two of this article, no debt whatever shall hereafter be created by, or on behalf of the state."

The relator claims that the obligations to be issued under R.C. 113.37 would constitute neither debts nor bonded indebtedness of the state which would conflict with Sections 1 and 3, Article VIII of the Ohio Constitution. In support of this position, the relator argues that the notes would be

---

[3] Section 2 of Article VIII lists several additional purposes for which debt may be incurred, including to repel invasion, to suppress insurrection, and to defend the state in war, none of which applies here. Also, the citizens of Ohio have, on various occasions, amended the Constitution in order to add additional specific purposes for which state indebtedness may be incurred. Sections 2b through 2k authorize debts for the following purposes: compensation for service in World War II (Section 2b); construction of the state highway system through monies from fees, excises, or license taxes (Section 2c); payment of Korean War Veterans' bonuses through the issuance of bonds secured by the full faith and credit of the state (Section 2d); a capital improvements construction program to acquire, construct, reconstruct, and otherwise improve and equip buildings and structures (Section 2e); a long-range program for financing public works (Section 2f); financing for highways to acquire rights-of-way and to construct and reconstruct highways (Section 2g); development (Section 2h); capital improvements (Section 2i); compensation for Vietnam Veterans (Section 2j); and capital improvements to public infrastructure (Section 2k).

In addition, Section 15, Article VIII authorizes the state to issue bonds to assist in Ohio coal research; Section 5, Article VI authorizes the state to guarantee repayment of student loans; Section 13, Article VIII authorizes the state (and political subdivisions) to issue economic development bonds; and Section 14, Article VIII enables the state to issue bonds for low-interest housing loans financed by making loans to lenders.

specifically designated as not constituting a debt of the state, that they would not be guaranteed by the faith and credit of the state, that they would be paid only from a special repayment fund created by this new law, that the holders could not anticipate taxes being levied for the payment of the notes, and that taxes would already have been levied, and monies already appropriated for the payment of the notes within the same fiscal year that the notes would be issued. Relator concludes that these factors demonstrate that such notes should not be considered state debt that is prohibited by Article VIII of the Ohio Constitution.

In *State* v. *Medbery* (1857), 7 Ohio St. 522, cited by the relator, a board of public works was legislatively authorized to enter into a five-year contract for the repair of the Ohio canal system. Although the contract extended over a five-year period, no appropriations were made to fund the contract. As a result, the court, in an opinion by Judge Swan, held that present obligations to pay money at a future time, without revenue and appropriations provided therefor, are debts of the state in contravention of Sections 1 and 3 of Article VIII of the Ohio Constitution.

In reaching this conclusion, Judge Swan analyzed Section 4, Article XII of the Ohio Constitution, which provides for raising sufficient revenue to defray the expenses of the state for each year, and Section 22, Article II, which prohibits withdrawing money from the treasury except pursuant to a specific appropriation made by law, and limits appropriations to two years' duration. According to Judge Swan, the General Assembly is free in its discretion to expend funds as it deems appropriate; however, the Constitution requires that the General Assembly also provide revenue to pay all expenses and claims within the biennium. *Id.* at 540. Holding that the General Assembly in *Medbery* failed to so provide, the court struck down the contract as creating an unconstitutional debt of the state.

Relator also relies upon *State, ex rel. Preston,* v. *Ferguson* (1960), 170 Ohio St. 450, 11 O.O. 2d 204, 166 N.E. 2d 365, wherein the second paragraph of the syllabus states that:

"Obligations of the state for which revenue has been provided and appropriations made for the payment thereof in the then current biennium are not debts within the meaning of Sections 1, 2c and 3, Article VIII, Ohio Constitution. (*State* v. *Medbery,* 7 Ohio St., 522, approved and followed.)"

Under laws then in effect (former R.C. 5501.112, Am. Sub. H.B. No. 906, 128 Ohio Laws 1130, 1131), the School Employees Retirement Board was legislatively authorized to enter into agreements with the Department of Highways to purchase and hold land that the Director of Highways, acting as the board's agent, considered necessary for the highway system. The duration of an agreement was limited to the current two-year period of appropriation to the highway department and could be renewed for additional periods of two years if a new appropriation was made, but no set of agreements and renewals could last longer than five years. The director was required to purchase from the board property bought and held by the board before the expiration of the agreement. In addition to the original purchase price, the director had to pay to the board an annual percentage of the original purchase price bargained for and made part of the agreement. This court analyzed this transaction as simply contractual in nature, constituting an agreement between a state department and a state-created agency

to purchase and repurchase land. It was not construed as a transaction involving borrowing by the state. The court held that since the prerequisites laid down in *Medbery, i.e.,* current appropriation and contract limited to the period of appropriation, were complied with, no constitutionally prohibited debt was created.

Respondent, however, disagrees with relator's claim that obligations entered into and funded in the current biennium are not debts within the meaning of Sections 1, 2 and 3, Article XIII of the Ohio Constitution. In support of this claim, respondent looks to the intent of the framers of our Constitution as evidenced by the dialogue from the Constitutional Convention of 1850-1851.[4] According to the respondent, this intent was given due regard in the *Medbery* opinion and confirmed by this court's holding in *State, ex rel. Lynch,* v. *Rhodes* (1965), 2 Ohio St. 2d 259, 1 O.O. 2d 545, 208 N.E. 2d 906.

In *Lynch,* the court considered the constitutionality of $25,000,000 of certificates of obligation issued by the commissioners of the Sinking Fund for highway purposes. The certificates were issued February 11, 1964 and were to be repaid by June 30, 1965. A majority of the court in explaining the certificates to be unconstitutional[5] as debts of the state not authorized by Sections 1 or 2 of Article VIII stated that "these 'certificates of obligation,' without any valid appropriation for their payment, represent a debt prohibited by Article VIII of the Constitution of Ohio." *Id.* at 266-267, 31 O.O. 2d at 549, 208 N.E. 2d at 910.

To further support her argument that state obligations which are due within the biennium may be unconstitutional debt, the respondent cites the findings and recommendations of the Commission for Constitutional Revision, a body created by the General Assembly in 1969 to review the Ohio Constitution and recommend changes. Upon reviewing Section 1, Article VIII, the commission recognized that the Constitution did not give the state short-term borrowing authority to meet cash flow shortfalls and proposed a constitutional amendment to grant the state such power.

---

[4] "Mr. HAWKINS said the first objection to the section, as originally reported, was the objection stated by the gentleman from Columbiana [Mr. GREGG], that it placed it in the power of the Legislature to increase the amount of the State debt by a yearly loan. This objection the committee had, by its amendments, endeavored to obviate; and to do so, he thought they had now provided conclusively that, though loaned at different times, the debt should never exceed the sum of seven hundred and fifty thousand dollars. At the same time, it does not deprive the State of the power, after one debt has been created and paid, to incur another. *A necessity may occur in 1851, for the making of a loan, and it may be paid during the next year.* Another want in 1856, may require another resort to borrowing; and to prohibit the Legislature from doing so, because one debt had been created and paid, would be absurd." (Emphasis added.) II Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of State of Ohio, 1850-1851 (1851) 425.

[5] Although four members of the court in *State, ex rel. Lynch,* v. *Rhodes, supra,* found the obligations to be unconstitutional debt, the majority did not prevail because at that time Section 2, Article IV, Ohio Constitution required the concurrences of six members of the court to declare a law unconstitutional except in affirming a decision of a court of appeals. Further, there were two somewhat differing opinions by members of the majority, *i.e.,* Chief Justice Taft and Justice O'Neill, although each of the four members of the majority concurred in each opinion.

Ohio Constitutional Revision Commission, Final Report (1977) 158, 162. Because an amendment similar to the commission's proposal was overwhelmingly defeated at the polls, the respondent concludes that the statute in the instant case is an attempt to legislate short-term debt authority in contravention of the express intent of the electorate to maintain the constitutional prohibitions against such debt.

These positions of both the relator, the newly created Ohio Funds Management Board, and the respondent, the Director of Budget and Management, each have certain points of merit. However, evaluating the totality of this new Act and applying all of the proper standards of constitutional review, we must conclude that clearly the more legally persuasive argument is that of the respondent.

At the outset we recognize the principle of statutory construction, which has been codified at R.C. 1.47, that:

"In enacting a statute, it is presumed that:

"(A) Compliance with the constitutions of the state and of the United States is intended."

See State v. Sinito (1975), 43 Ohio St. 2d 98, 101, 72 O.O. 2d 54, 56, 330 N.E. 2d 896, 898, citing State, ex rel. Poe, v. Jones (1894), 51 Ohio St. 492, 37 N.E. 945; and State, ex rel. Dickman, v. Defenbacher (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E. 2d 59. However, it remains the ofttimes awesome duty of this court to review questioned statutes to determine their constitutionality. State, ex rel. Shkurti, v. Withrow (1987), 32 Ohio St. 3d 424, 513 N.E. 2d 1332; State, ex rel. Duerk, v. Donahey (1981), 67 Ohio St. 2d 216, 1 O.O. 3d 135, 423 N.E. 2d 429.

Applying this standard in the case sub judice, we find that R.C. 113.31 et seq. are unconstitutional in that they authorize state debt contrary to Sections 1 and 2 of Article VIII.

Relator contends that the notes issued pursuant to R.C. 113.31 et seq. are not debts of the state and therefore are not constitutionally prohibited. We disagree. After a detailed analysis of this Act, in light of prior decisions of this court, we must conclude that the notes, if issued, would create an unconstitutional debt of the state.

In reaching this conclusion, we must look to both the plain language and practical effect of R.C. 113.31 et seq. This court must examine a transaction not only for what it purports to be, but what it actually is. State, ex rel. Kitchen, v. Christman (1972), 31 Ohio St. 2d 64, 60 O.O. 2d 42, 285 N.E. 2d 362.

Evaluating the notes in the case sub judice we find that they are authorized by Am. Sub. H.B. No. 449. Within this Act, R.C. 113.34(C) provides that "[t]he notes shall be special obligations of the state issued, secured, and payable as provided in sections 113.31 to 113.46 of the Revised Code." In addition, the notes and expenses of issuance of the notes are to be repaid from anticipated revenues, including tax revenues. R.C. 113.37(A)(3), 113.37(B)(2). "Revenue" in this context means "any taxes, excises, fees, grants, or other moneys credited to or anticipated to be credited to the general revenue fund." R.C. 113.31 (L). Furthermore, the Treasurer is instructed by statute to covenant on behalf of the state to "cause deposits or revenues to be made to the note service fund sufficient in time and amount to pay note service charges as they become due and payable." R.C. 113.37(A)(3).

The segregation, by R.C. 113.37 (A)(3), of the tax revenues from which the notes are to be repaid into a separate account, entitled the "Note

Service Fund," pursuant to R.C. 113.37(A)(3), does not alter the character of these funds, as they are still general tax revenues, generated pursuant to the state's taxing authority. Additional proof that these notes are debts of the state paid from tax revenues within the General Revenue Fund is found within Section 3 of Am. Sub. H.B. No. 449 itself. This section provides:

"*Payments of Note Service Charges and Financing Costs on Notes Issued by the State*

"There are hereby appropriated from the General Revenue Fund to the Treasurer of State funds sufficient to pay principal, interest, and premium, if any, payable on notes issued by the State of Ohio under sections 113.31 to 113.46 of the Revised Code, and for paying financing costs and costs for the services described in division (A)(2) of section 113.37 of the Revised Code to the extent not paid from note proceeds." (Emphasis *sic*.) 142 Ohio Laws, Part II, 3806.

In addition, the noteholders may be given a perfected security interest in the tax revenues deposited and to be deposited in the Note Service Fund. R.C. 113.37(B)(2). Moreover, "[t]he notes shall be signed on behalf of the state by the treasurer of state, and the seal of the state shall be affixed thereto." R.C. 113.37(G). Further, the Treasurer's commitment to pay into the Note Service Fund sufficient revenues or taxes to timely pay the principal and interest of the notes issued is enforceable by the noteholders pursuant to R.C. 113.42.

This authority granted to the noteholders to require the Treasurer to deposit sufficient tax revenues into the Note Service Fund to pay the notes may be exercised notwithstanding the statement in the notes themselves that "they do not * * * represent or con-stitute a debt or bonded indebtedness of the state within the meaning of any provision of the Ohio Constitution * * *" or the statement that "* * * [t]he holders or owners of notes shall not be given the right, and have no right, to have excises or taxes levied by the state for the purpose of paying note service charges * * *." R.C. 113.37(C). The Note Service Fund from which the notes are to be paid is, in part, money raised by taxation. Segregating the funds into a special account will not change this fact.

Citing *Medbery, supra,* the relator takes the position that since the notes issued pursuant to R.C. 113.31 *et seq.* will not extend beyond the fiscal biennium, they cannot constitute an unconstitutional debt of the state. The relator, however, improperly relies upon *Medbery* for authority that all contracts entered into within the framework of biennium appropriation will survive constitutional scrutiny. Merely because a debt does not extend beyond the biennium does not magically transform it into a nondebt, and *Medbery* does not so hold.

In *Medbery,* debts for services to be performed on the canals were to have accrued beyond the biennium and thus were held to be unconstitutional. However, Judge Swan stated that even contracts for less than two years would be unconstitutional and void if there were no appropriations made for the contracts. *Id.* at 529-530. In addition, *Medbery* involved a state contract for the performance of services, not the borrowing of money. This was pointed out by Justice C. William O'Neill in *State, ex rel. Lynch,* v. *Rhodes, supra:* "Judge Swan, in *State* v. *Medbery, supra,* recognized the distinction between *borrowing money* and claims against the state * * * for services to be performed or materials and labor to be furnished * * *.

"* * * There was no borrowing of money in *Medbery*." (Emphasis *sic*.) *Id*. at 270-271, 31 O.O. 2d at 551, 208 N.E. 2d at 912-913.

The majority of this court in *Lynch, supra,* emphasized that borrowing by the state creates a debt of the state, regardless of the duration of the loan. "We ordinarily think of an obligation to pay a certain amount as an indebtedness for that amount or a debt. Hence, we would ordinarily think of an 'obligation of the state' as a debt of the state." *Id*. at 263, 31 O.O. 2d at 547, 208 N.E. 2d at 908. (Opinion of Chief Justice Taft.)

This court, in its history of reviewing Sections 1, 2 and 3 of Article VIII of the Ohio Constitution, has been a watchful guardian of the concern of the framers of these constitutional prohibitions against the creation of state debt not authorized by the Constitution, and we feel constrained to again give heed to such concerns.[6] There have been few exceptions to the constitutional constraints of Sections 1 and 3 of Article VIII allowed by this court. In essence such exceptions have been those financial transactions involving the erection or construction of a revenue-producing public building or facility, whose proceeds were placed in a "special fund." See, *e.g., Kasch* v. *Miller* (1922), 104 Ohio St. 281, 135 N.E. 813 (lender paid by revenue from sale of water and power); *State, ex rel. Pub. Institutional Building Auth.,* v. *Griffith* (1939), 135 Ohio St. 604, 14 O.O. 533, 22 N.E. 2d 200 (bonds paid by revenues from rents for buildings);

*State, ex rel. State Bridge Comm. of Ohio,* v. *Griffith* (1940), 136 Ohio St. 334, 16 O.O. 467, 25 N.E. 2d 847; *State, ex rel. Allen,* v. *Ferguson* (1951), 155 Ohio St. 26, 44 O.O. 63, 97 N.E. 2d 660 (Ohio Turnpike bonds).

This exception to the constitutional debt limitations is stated in the first paragraph of the syllabus of *Griffith, supra:*

"The debt limitation prescribed by Sections 1 and 3 of Article VIII of the Ohio Constitution does not apply to an indebtedness incurred in the procurement of property or erection of buildings or structures for the use of the state, to be paid for wholly out of revenues or income arising from the use or operation of the particular property for the procurement or construction of which the indebtedness is incurred. (*Kasch* v. *Miller, Supt. of Public Works,* 104 Ohio St., 281, approved and followed.)"

However, both parties agree that a "special fund" obligation is not involved in the instant case. No bonds are to be issued pursuant to this new law, no facilities will be provided or constructed with the note proceeds, and no income will be generated by any facility to retire the obligations. The notes will be retired by tax revenues.

In *State, ex rel. Shkurti,* v. *Withrow, supra,* this court recently held a proposed transaction to issue bonds which were declared not to be obligations of the state, but for which tax revenues were pledged for debt service, to be unconstitutional in contravention of Section 1 and Section 3

---

[6] This constitutional limit does not prevent the electorate from authorizing additional state debt by constitutional amendment. For example, over the past ten years, the outstanding bond and note indebtedness of Ohio's state and local governments, issued pursuant to specific constitutional authority, increased by one hundred thirty-four percent. In addition, debt service obligations, $429 million, consumed four percent of the state's General Revenue Fund expenditures for fiscal year 1989. Economic Report, Ohio Public Expenditure Council, Aug. 1990.

of Article VIII of the Ohio Constitution. Citing *State, ex rel. Kitchen,* v. *Christman* (1972), 31 Ohio St. 2d 64, 60 O.O. 2d 42, 285 N.E. 2d 362, the *Shkurti* court observed: "Although nothing would obligate this or subsequent General Assemblies to continue to levy or pledge these tax revenues for such debt service, '[i]t is inconceivable that * * * [they] would not do so, since the public credit of the state would be at stake.' *Christman, supra,* at 75, 60 O.O. 2d at 49, 285 N.E. 2d at 369."

At this point, it might be well to refer to the argument of the relator that public policy favors constitutionality of the Act. Although not controlling in a constitutional analysis, strong public policy arguments, supported by sufficient evidence, may be persuasive. However, the relator has not substantiated its argument that cash flow would be better managed by revenue anticipation notes than by early investment withdrawals which would cause penalties and loss of interest income. Nor has relator shown that the issuance of tax revenue anticipation notes would result in additional revenues to the state.

An additional public policy argument made by *amicus curiae,* Ohio Chamber of Commerce, is that this legislation cannot truly represent the public policy of Ohio in light of the overwhelming majority which voted against a proposed amendment to authorize the legislature to issue tax anticipation notes. Also, relative to this public policy argument, it may be noted that a less than overwhelming majority of the General Assembly voted for Am. Sub. H.B. No. 449.[7]

Concerning the argument advanced by the parties on the significance of the proposed constitutional amendment to Sections 1 and 3 of Article VIII of the Ohio Constitution, we need only point out that the amendment failed, and these constitutional restrictions on debt remain as previously construed by this court.

It may very well be that the constitutional debt limit of $750,000[8] established in 1851 is extremely low in today's inflated dollar. However, although we should give a modern interpretation to the words of the Constitution where possible, we must not do "violence to the plain language employed or transgres[s] the clear bounds of reason." *State, ex rel. Cohn,* v. *Ketterer* (1934), 127 Ohio St. 483, 494, 189 N.E. 252, 256.

More particularly, we must be guided in our constitutional interpretation by a well-known principle, stated in the first paragraph of the syllabus of *Castleberry* v. *Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E. 2d 861: "In the interpretation of an amendment to the Constitution the object of the people in adopting it should be given effect; the polestar in the construction of constitutional, as well as legislative provisions, is the intention of the makers and adopters thereof." See, also, *State, ex rel. Swetland,* v. *Kinney* (1982), 69 Ohio St. 2d 567, 23

---

[7] Am. Sub. H.B. No. 449 passed the Senate by a vote of 21 for, and 11 against. Ohio Senate Journal (Mar. 10, 1988) 1519. It passed the House by a vote of 55 for, and 42 against. Ohio House of Representatives Journal (Mar. 15, 1988) 1604.

[8] The limit of $750,000 is for all state debt not otherwise allowed. It could reasonably be argued that cash flow deficiencies which, by the agreed statement of facts herein, depend on "cyclical fluctuations" in revenue, "generally understood and predictable" do not qualify as "casual deficits" within the meaning of Section 1, Article VIII.

O.O. 3d 479, 433 N.E. 2d 217; *State, ex rel. Shkurti,* v. *Withrow, supra.* Although this enactment may have certain merit in providing another mechanism for state fiscal management, it is inconsistent with the constitutional limitations on state debt.

It should be noted that this decision in no way hinders the Ohio General Assembly, or the Director of Budget and Management, or the Controlling Board, in utilizing the currently available devices for fiscal management. This board has been provided considerable flexibility to oversee and manage the allocation of the revenues of the state to the various budgeted needs of the state as it determines them. Exemplary of its broad fiscal management authority, the Controlling Board may authorize the following: under Subsection (A) of R.C. 127.14, transfers of all or part of the appropriation within state agencies; under Subsection (B), transfers of all or part of an appropriation from one fiscal year to another; under Subsection (C), transfers of all or part of an appropriation between state agencies in certain instances; under Subsection (D), transfers of "all or part of their cash balances in excess of needs from any fund of the state to the general revenue fund or to such other fund of the state to which the money would have been credited in the absence of the fund from which the transfers are authorized to be made," with the exception of certain designated funds; and under Subsection (F), "[t]emporary transfers of all or part of an appropriation or other moneys into and between existing funds, or new funds, as may be established by law when needed for capital outlays for which notes or bonds will be issued." Additionally, pursuant to the last sentence of R.C. 127.14, "[t]he board may delegate to the director of budget and management authority to approve transfers among items of appropriation under division (A) of this section."

In light of this fiscal flexibility provided by law, neither the General Assembly nor the fiscal authorities of the state should find it impossible to adjust available revenues in existing funds to meet the temporary cash flow deficiencies that may arise from time to time.

The relator not having presented to this court a clear showing of its right to the relief sought, the writ of mandamus is hereby denied.

*Writ denied.*

MOYER, C.J., WRIGHT, H. BROWN and RESNICK, JJ., concur.

SWEENEY and DOUGLAS, JJ., dissent.

DOUGLAS, J., dissenting. Once again, a majority of this court embarks upon a frolic of its own in deciding an issue that is clearly not now before the court. Most recently, this occurred in *State, ex rel. Sears, Roebuck & Co.,* v. *Indus. Comm.* (1990), 52 Ohio St. 3d 144, 556 N.E. 2d 467, rehearing denied (1990), 55 Ohio St. 3d 601, 561 N.E. 2d 937. This trend is unfortunate.

The parties (and the *only* parties) herein are the Ohio Funds Management Board, as relator, and L. Lee Walker, Director of Budget and Management for the state of Ohio, the respondent. R.C. 113.34(A) requires the respondent to furnish to relator and the Treasurer of State a monthly estimate of the current balance of the state's General Revenue Fund as of the last day of the immediately preceding month and an estimate of the anticipated revenues and expenditures, monthly, for the rest of the fiscal year. R.C. 113.34(B) provides

that if the relator, after receiving the required report of respondent, determines that a cash flow deficiency will occur within the current fiscal year that should be alleviated through the issuance of notes, then relator shall recommend that the Treasurer of State issue notes to alleviate such deficiency. The Treasurer *may,* but *is not required* to, issue such notes.

The majority herein decides that it would be unconstitutional to issue such notes. That may or may not be so, but that issue is not before us at this time. All relator requests is that respondent be required to prepare and deliver a report as directed by the General Assembly in R.C. 113.34(A). There is nothing unconstitutional about the General Assembly's requiring the Director of Budget and Management to issue a fiscal report. In fact, some, including me, might think that is a pretty good idea! The respondent refuses to issue the report and relator seeks to compel respondent to perform her R.C. 113.34(A) duties. The mandamus should issue.

Since the question of the constitutionality of any such note issuance is not before us, any extensive discussion of this merit issue would not be appropriate. Suffice to say that the General Assembly passed R.C. 113.31 *et seq.* by a substantial bipartisan majority in each branch. It did so, in effect, for the purpose of avoiding a tax increase upon Ohio citizens.

Further, I read some of the cases reviewed by the majority differently than it does. Specifically, the majority cites and extensively reviews *State* v. *Medbery* (1857), 7 Ohio St. 522. For some reason, the majority does not set forth or consider the following language from *Medbery:*

"Under this system of prompt payment of expenses and claims as they accrue, there is, undoubtedly, after the accruing of the claim, and before its actual presentation and payment, a period of time intervening in which the claim exists unpaid; but to hold for this reason a debt is created, would be the misapplication of the term debt, and substituting for the fiscal period a point of time between the accruing of a claim and its payment for the purpose of finding a debt; but appropriations having been previously made and revenue provided for payment as prescribed by the constitution, such debts, if they may be so called, are, in fact, in respect of the fiscal years, provided for, with a view to immediate adjustment and payment. Such financial transactions are not, therefore, to be deemed debts." *Id.* at 529.

This portion of *Medbery* was upheld by this court in *State, ex rel. Ross,* v. *Donahey* (1916), 93 Ohio St. 414, 113 N.E. 263, a case not cited by the majority. The majority does cite *State, ex rel. Preston,* v. *Ferguson* (1960), 170 Ohio St. 450, 11 O.O. 2d 204, 166 N.E. 2d 365, and the second paragraph of the syllabus thereof which states:

"Obligations of the state for which revenue has been provided and appropriations made for the payment thereof in the then current biennium are not debts within the meaning of Sections 1, 2c and 3, Article VIII, Ohio Constitution. (*State* v. *Medbery,* 7 Ohio St. 522, approved and followed.)"

It is difficult to comprehend, giving a literal and accurate reading of the precise language of *Preston,* how the holding is inapplicable to the case now before us. Whether or not the facts of *Preston* involved the direct borrowing of money, the syllabus of the case is clear and should be either overruled — or followed. The notes proposed to be issued pursuant to the legislation now under attack are cer-

tainly "obligations of the state" and revenue has been provided for the payment of the notes in each current biennium and, thus, according to *Preston,* they are not "debts" within the meanings of Sections 1, 2c and 3 of Article VIII, Ohio Constitution.

For the foregoing reasons, but especially because the issue of constitutionality of the note issuance is not now before us, I must dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.