THE STATE, EX REL. SHKURTI, DIRECTOR, OFFICE OF BUDGET AND
MANAGEMENT, *v.* WITHROW, TREASURER.

[Cite as State, ex rel. Shkurti, *v.* Withrow (1987), 32 Ohio St. 3d 424.]

(No. 87-1314—Decided September 21, 1987.)

*Bricker & Eckler, Gerald L. Draper* and *Diane M. Signoracci,* for relator.

*Anthony J. Celebrezze, Jr.,* attorney general, *Kathleen McManus* and *Cherry Lynne Poteet,* for respondent.

*Porter, Wright, Morris & Arthur, Ronald W. Gabriel* and *Kathleen Seward Northern,* urging support of the respondent's position for *amicus curiae,* Ohio Chamber of Commerce.

*Per Curiam.* Sections 1, 2, and 3 of Article VIII of the Ohio Constitution provide:

"The state may contract debts to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the general assembly, or at different periods of time, shall never exceed seven hundred and fifty thousand dollars; and the money, arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever." (Section 1.)

"In addition to the above limited power, the state may contract debts to repel invasion, suppress insurrection, defend the state in war, or to redeem the present outstanding indebtedness of the state; but the money, arising from the contracting of such debts, shall be applied to the purpose for which it was raised, or to repay such debts, and to no other purpose whatever; and all debts, incurred to redeem the present outstanding indebtedness of the state, shall be so contracted as to be payable by the sinking fund, hereinafter provided for, as the same shall accumulate." (Section 2.)

"Except the debts above specified in sections one and two of this article, no debt whatever shall hereafter be created by or on behalf of the state." (Section 3.)

It then follows that if the proposed bond issuance creates a debt of the state exceeding $750,000, it is prohibited by Sections 1 and 3 of Article VIII unless it is an exception to the prohibitions of these sections.

Relator argues that the proposed bond issuance is authorized under the express exception stated in Section 2 of Article VIII for "the present outstanding indebtedness of the state," or alternatively, the "special fund" exception created by prior decision of this court.[1] We reject both of these contentions and find that the proposed bond issuance would violate Sections 1 and 3 of Article VIII of the Ohio Constitution. Accordingly, we decline to issue the writ.

Taking first the express exception

---

[1] See *Kasch* v. *Miller* (1922), 104 Ohio St. 281, 135 N.E. 813; *State, ex rel. Pub. Institutional Bldg. Auth.,* v. *Griffith* (1939), 135 Ohio St. 604, 14 O.O. 533, 22 N.E. 2d 200; *State, ex rel. Bridge Comm. of Ohio,* v. *Griffith* (1940), 136 Ohio St. 334, 16 O.O. 467, 25 N.E. 2d 847; and *State, ex rel. Allen,* v. *Ferguson* (1951), 155 Ohio St. 26, 44 O.O. 63, 97 N.E. 2d 660.

of Section 2 of Article VIII, we find, as respondent argues, that this exception to the debt prohibitions of Sections 1 and 3 was intended to apply only to the outstanding debt in 1851, at the framing of the Constitution. First, the precise modification of "outstanding indebtedness" by the definite article "the," and the adjective "present," virtually compels this conclusion. Second, examination of the relevant constitutional debates[2] convinces us that the then outstanding debt concerned the framers. They debated the wisdom of the sinking fund procedure for the retirement of that debt, the equity and practicality of relatively early retirement of the debt versus more extended retirement periods and, consequently, the amount that should be committed annually to the sinking fund to retire the principal and interest on the debt. The debates do not indicate any broader purpose for this exception.

Relator argues that constitutions should not be given lifeless or static interpretations, citing our decision in *State, ex rel. Columbus,* v. *Ketterer* (1934), 127 Ohio St. 483, 189 N.E. 252. However, that decision also states that:

"* * * They [constitutions] should be given a flexible interpretation such as will meet new conditions and circumstances as they arise, and which necessity may demand *without doing violence to plain language employed or transgressing the clear bounds of reason* * * *." (Emphasis added.) *Id.* at 494, 189 N.E. at 256.

The interpretation of Section 2 of Article VIII urged by relator would both do violence to plain language *and* transgress the bounds of reason. Moreover, the principle of constitu-

tional construction stated in *Ketterer* does not supplant that stated in paragraph one of the syllabus of *Castleberry* v. *Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E. 2d 861:

"In the interpretation of an amendment to the Constitution the object of the people in adopting it should be given effect; the polestar in the construction of constitutional, as well as legislative, provisions is the intention of the makers and adopters thereof." See, also, *State, ex rel. Swetland,* v. *Kinney* (1982), 69 Ohio St. 2d 567, 570, 23 O.O. 3d 479, 481, 433 N.E. 2d 217, 220.

So finding, we find it unnecessary to discuss alternative theories argued by the parties on this issue.

Relator also argues that the proposed bond issuance is authorized by the judicially created "special fund" exception to the debt prohibition of Article VIII. Although not the earliest case, this exception was best stated in the first paragraph of the syllabus in *State, ex rel. Pub. Institutional Bldg. Auth.,* v. *Griffith* (1939), 135 Ohio St. 604, 14 O.O. 533, 22 N.E. 2d 200:

"The debt limitation prescribed by Sections 1 and 3 of Article VIII of the Ohio Constitution does not apply to an indebtedness incurred in the procurement of property or erection of buildings or structures for the use of the state, to be paid for wholly out of revenues or income arising from the use or operation of the particular property for the procurement or construction of which the indebtedness is incurred. (*Kasch* v. *Miller, Supt. of Public Works,* 104 Ohio St., 281, approved and followed.)"

We first note that in *Griffith* and *Kasch* and the subsequent cases ap-

---

[2] 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-1851 (1851), at 476 *et seq.*

proving the special fund exception,[3] the bonds to be issued were to finance construction of a tangible, income-producing property whose income was then pledged to retire the bonds. In the instant case, no such property is constructed or acquired. Rather, an outstanding liability is refunded. Since no property is constructed or acquired, there is no income from the property to pay debt service. Instead, a "surcharge" on current employer contributions is created (R.C. 4141.251) and pledged (R.C. 4141.48[C] and [Q]) to retire the bonds. While this proposed transaction parallels the special fund exception previously sanctioned by this court, it does not fall within the limits of that exception; rather, it is a significant extension of that exception.

Relator cites cases in other jurisdictions that have approved similar extensions of the special fund exception. We decline to follow them on the basis of our previous decisions in *State, ex rel. Pub. Institutional Bldg. Auth.*, v. *Griffith, supra*, and *State, ex rel. Pub. Institutional Bldg. Auth.*, v. *Neffner* (1940), 137 Ohio St. 390, 19 O.O. 112, 30 N.E. 2d 705. In these cases, this court found variant plans to issue revenue bonds for the construction of state institutions, secured by the pledge of state revenues of the Department of Public Welfare, to be prohibited by Sections 1 and 3 of Article VIII.

In *Griffith*, the programs in issue provided that the authority would issue the bonds and enter into a contract with the department, under which contract the department would pledge all its available income to maintain the facilities and pay the debt service, through the building authority. Among other things, this court noted that the revenues of the department were

public funds subject to legislative control, *id.* at 619, 14 O.O. at 539-540, 22 N.E. 2d at 207, and held that the contractual obligation of the department created an indebtedness in violation of Sections 1 and 3 of Article VIII. In refusing to accept this plan under the special fund exception, the court emphasized that the exception approved in *Kasch* v. *Miller* and elsewhere applied to indebtedness created "* * * '* * * by obtaining *property* to be paid for *wholly* out of the income of the property.' (Emphasis added, in part.) *Id.* at 612, 14 O.O. at 536, 22 N.E. 2d at 204."

In *Neffner*, the program under consideration was apparently framed to avoid this court's objections in *Griffith*. The authority was to issue bonds to construct an institution. The bonds were designated as not being general obligations of the state or the authority. The authority was to enter into a contract with the department to rent the facility, but the obligation of the department to pay rent was not unconditional, and only fees received for support of patients in the institution were pledged as rent. The rent then received by the authority was to be segregated in a special fund, which was to be outside the state treasury, as in the instant case. Hence, the *Neffner* program apparently overcame the problem of the *Griffith* statute by pledging only revenues received for rent of the specific facility. This court, however, noting the obligation of the state to care for the mentally ill and disabled under Section 1 of Article VII of the Ohio Constitution, held:

"Where substantial funds which have heretofore gone into the general funds of the state treasury are pledged to liquidate such bonds, thereby requiring the state to seek and secure revenues otherwise in order to meet its obligations to care for and support its

---

[3] See fn. 1.

wards, then the obligation of those bonds does become the ultimate obligation of the state. To hold otherwise would result in an evasion of the constitutional limitations." *Neffner, supra,* at 399, 19 O.O. at 115, 30 N.E. 2d at 709.

Relator attempts to distinguish *Griffith* and *Neffner* because there the pledged revenues were existing state funds, whereas in the instant case, the "surcharge" under R.C. 4141.251 is newly created and specifically earmarked only to retire such bonds. We find this distinction to be of no legal significance. Moreover, as stated in *Neffner* and *State, ex rel. Kitchen,* v. *Christman* (1972), 31 Ohio St. 2d 64, 60 O.O. 2d 42, 285 N.E. 2d 362, this court examines the substance of such proposed transactions, not merely their form. The proposed transaction is to issue bonds that, although declared not to be obligations of the state, nevertheless pledge tax revenues for debt service.[4] Although nothing would obligate this or subsequent General Assemblies to continue to levy or pledge these tax revenues for such debt service, "[i]t is inconceivable that * * * [they] would not do so, since the public credit of the state would be at stake." *Christman, supra,* at 75, 60 O.O. 2d at 49, 285 N.E. 2d at 369. Hence, in substance, the proposed transaction is the incurring of debt and the pledging of tax revenues not to acquire or construct income-producing property, but to fund a governmental program. Even though the proposed transaction would use a "special fund" to accomplish this, it does not come within the special fund exception to the debt prohibitions of Article VIII previously approved by this court in *Kasch* v. *Miller, supra,* and subsequent cases and, in fact, closely parallels the proposed transaction disapproved in *Neffner.*

The consequences of permitting such transactions was foreseen long ago by the Supreme Court of Montana:

"The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance.

"Under this contention the legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation. (*Crick* v. *Rash,* 190 Ky. 820, 229 S.W. 63.)" *State, ex rel. Diederichs,* v. *State Highway Comm.* (1931), 89 Mont. 205, 211-212, 296 P. 1033, 1035.

Relator argues further that this court must not declare a legislative Act unconstitutional unless it clearly appears that the Act is in direct conflict with constitutional provisions. *State, ex rel. Duerk,* v. *Donahey* (1981), 67 Ohio St. 2d 216, 21 O.O. 3d 135, 423 N.E. 2d

---

[4] This court has found the underlying employer "contributions," on which the "surcharge" of R.C. 4141.251 is based, to be excise taxes, *State, ex rel. Youngstown Sheet & Tube Co.,* v. *Leach* (1962), 173 Ohio St. 397, 20 O.O. 2d 33, 183 N.E. 2d 369, paragraph one of the syllabus. Hence, the "surcharge" is, in fact, a surtax.

429. In support, he cites the provision of R.C. 4141.48(C) that declares that the proposed bonds "do not constitute a debt or a pledge of the faith and credit of the state * * *." We take this to mean that even if the proposed transaction fits no existing exception to the debt prohibitions of Article VIII, it still is not prohibited debt. While the relator is correct about the deference this court owes to legislative acts, his reliance on the statute's declaration is misplaced. Such reliance would make the General Assembly and not this court the final and conclusive authority of the constitutional debt question. The interpretation of the Ohio Constitution is, however, not a legislative but a judicial question, which ultimately this court must decide. *Cincinnati, Wilmington & Zanesville RR. Co.* v. *Commrs. of Clinton Cty.* (1852), 1 Ohio St. 77. See, also, *Boswell* v. *State* (1937), 181 Okla. 435, 437, 74 P. 2d 940, 943.

Respondent argues that the proposed bond issuance would violate Section 4, Article VIII of the Ohio Constitution by lending the state's aid and credit to the state's employers. While a majority of this court doubts that such an application of tax revenues can be viewed as a lending of aid and credit to benefitted taxpayers, because of our decision on the debt issue, we decline to rule on this issue. *State, ex rel. Lieux,* v. *Westlake* (1951), 154 Ohio St. 412, 43 O.O. 343, 96 N.E. 2d 414, paragraph one of the syllabus. Similarly, we do not address the additional constitutional issues raised by the *amicus curiae,*[5] nor the objections of relator to the introduction of these additional issues.

*Writ denied.*

MOYER, C.J., HOLMES, WRIGHT and H. BROWN, JJ., concur.

SWEENEY, J., dissents.

LOCHER and DOUGLAS, JJ., dissent with opinion.

DOUGLAS, J., dissenting. Because I believe that today's decision is not based on sound legal principles or realistic constitutional interpretation, I must dissent.

Before I begin my analysis of the constitutional issues posed by this case, I think it is important to understand the benefits that would, allegedly, accrue from the proposed bond issuance.

As a result of Ohio's failure to repay, by November 10, 1982, the full amount of the outstanding balance borrowed from the federal government to keep our Unemployment Compensation Fund solvent, the *net* tax rate imposed upon Ohio employers has increased from 0.7 percent prior to tax year 1982 to 1.9 percent for tax year 1986. If the entire outstanding balance is not paid by November 10, 1987, the rate will increase to 2.0 percent. If the balance is paid off by that date, the rate would be 0.6 percent.

In addition, the state is liable for interest on the outstanding balance. These interest payments have increased from $0.4 million for the federal fiscal year ending September 30, 1982 to a whopping $72.3 million for the year ending September 30, 1986. Interest liability on the remaining balance for the fiscal year ending

---

[5] The *amicus curiae* argues that R.C. 4141.251 and 4141.48 impose tax liability retroactively in violation of Section 28, Article II of the Constitution and that Am.

Sub. H.B. No. 171 contains more than one subject in violation of Section 15(D), Article II of the Ohio Constitution.

September 30, 1987 is approximately $88.6 million. This is true even though the outstanding balance as of May 31, 1987 totals only about $219.5 million.

Pursuant to Section 7, Rule VIII of the Rules of Practice of the Supreme Court, the parties, in an original action filed in this court, are instructed to present to the court, *inter alia,* "agreed statements of facts." The parties have presented such an agreed statement of facts to us. The statement contains sixteen separate affirmative statements. Statement number eight says, in part, that "[t]he burden on Ohio's employers as a result of the outstanding loan balance will be equivalent to 1.4% of Ohio's taxable payroll under FUTA, or approximately $350,000,000." Statement number nine says that "[t]he issuance of bonds and repayment of outstanding Federal advances pursuant to R.C. 4141.48 will save Ohio employers approximately $37 per employee for the period of 1987-1990."

As I review the record, it is my impression that these statements are not entirely accurate. Not having oral argument on this important case, however, has prevented me from testing these assertions. In fact, it appears to me that the increase to Ohio's employers will be 0.1 percent — from 1.9 percent to 2.0 percent under the existing system — and something else under the proposed financing of the debt plan. My guess is that the question revolves around the massive interest payments which are *now* being paid from the General Fund of Ohio but would probably be paid by employers as part of the surtax which would be levied to amortize the bond issue.

Whatever might be the case, the bond issuance contemplated by R.C. 4141.48 was designed to eliminate the outstanding balance owed to the federal government. To accomplish this purpose, the General Assembly has passed the legislation now under constitutional scrutiny. The judgment of our legislature in this case, as in every case, is entitled to the greatest deference.

I recognize, of course, that the wisdom of a particular item of legislation is not dispositive of its constitutionality. However, I am convinced that the instant enactments do meet constitutional muster. I would propose the following analysis.

Every challenge to the constitutionality of a legislative enactment carries the heavy burden of overcoming the strong presumption that the challenged statute is, in fact, constitutional. Courts must strive to uphold the enactment unless it is clearly unconstitutional beyond a reasonable doubt. See, *e.g., State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 147, 57 O.O. 134, 137, 128 N.E. 2d 59, 63; *Roosevelt Properties Co.* v. *Kinney* (1984), 12 Ohio St. 3d 7, 13, 12 OBR 6, 11, 465 N.E. 2d 421, 427. The application of this principle to the instant cause leads to the conclusion that the challenges which have been raised by respondent and *amicus* to the constitutionality of R.C. 4141.48 must fail.

It has long been recognized that the debt limitations contained in Sections 1 and 3, Article VIII of the Ohio Constitution do not apply to an indebtedness incurred in the undertaking of a project to be paid for entirely out of the revenue flowing from the project itself. See, *e.g., State, ex rel. Pub. Institutional Bldg. Auth.,* v. *Griffith* (1939), 135 Ohio St. 604, 14 O.O. 533, 22 N.E. 2d 200; *Kasch* v. *Miller* (1922), 104 Ohio St. 281, 135 N.E. 813. The issuance of revenue bonds and the establishment of a "special fund" from which repayment will be made have not been considered the creation of a

state debt forbidden by the Constitution, since the bonds so issued do not become an obligation or pledge the credit of the state. *State, ex rel. Pub. Institutional Bldg. Auth., supra,* at 613, 14 O.O. at 537, 22 N.E. 2d at 204. See, also, *State, ex rel. Bridge Comm. of Ohio,* v. *Griffith* (1940), 136 Ohio St. 334, 16 O.O. 467, 25 N.E. 2d 847; *State, ex rel. Allen,* v. *Ferguson* (1951), 155 Ohio St. 26, 44 O.O. 63, 97 N.E. 2d 660, paragraph six of the syllabus.

The majority distinguishes these cases on the ground that they all involved specific, tangible income-producing structures such as turnpikes, toll bridges and buildings. I recognize this distinction but find it not to be fatal to the proposed bond issue. I see no good reason why the "special fund" exception should not be extended in this instance. The legislation at bar is no less an income-producing proposition than a toll bridge or a dam. In reality, and by its terms, the legislation does not incur an obligation "by or on behalf of the state" as prohibited by Section 3, Article VIII of the Ohio Constitution. *The bond issuance does not put the state of Ohio at risk.* Nothing in the legislation or the bond issue pledges the full faith and credit of the state for the payment of the bond obligations. It is the bondholders who will incur the risk.

The majority expresses its concern that inclusion of the instant legislation within the "special fund" exception will open the floodgates to unlimited schemes for creating debt under the guise of an "agricultural fund" and a "public health fund" and the like. This concern could be put to rest simply by limiting our decision strictly to the facts presented herein. By restricting the use of the instant case as precedent, and by approaching future cases on their facts alone, we could effectively eliminate the danger of artificial circumvention of the constitutional debt prohibitions.

In its *amicus curiae* brief, the Ohio Chamber of Commerce argues that the proposed issuance of bonds totalling $315.4 million is in excess of the amount needed to retire the debt, since the aggregate obligation to the federal government stands at only $287.1 million. Without commenting on the propriety of the $315.4 million amount certified by relator, I would note that a decision upholding the bond issuance as constitutional would in no way authorize an issuance which is inconsistent with the terms of the statute itself.

In this year when we celebrate the two-hundreth anniversary of our United States Constitution, we have, time and again, heard the framers of that great document lauded for their foresight in providing us with a document that is luminous and precise enough in its pronouncements to assure continuity and stability but yet obscure and general enough to permit the flexibility necessary to deal with current problems of an ever-evolving and changing society. Should we give any less respect or credit to those who framed the Ohio Constitution of 1851? Is it not reasonable to assume that when so many of our most prominent Ohio citizens met in convention in Cincinnati and, on March 10, 1851, ratified the Constitution by which we today, as amended, are governed that it was their intention to give to us a blueprint to specifically guide us on a number of matters, yet leave room for us to propose and adopt projects for the general public good?

Should we not, concerning our Constitution, be asking what the words of the text mean in our time? Was it intended that our Constitution rest in static meaning thereby glorifying a world that is dead and gone rather

than being used as a useful tool to solve modern-day problems? I think not! Rather, I believe, that the genius of our Ohio document is and should be the adaptability of its great principles to cope with current problems and current needs.

This is not to say that we should not remain faithful to the fundamental and basic precepts of our Constitution. Acceptance, however, of those fundamental principles should not inextricably bind us to precise, sometimes even anachronistic doctrines that have no relevance to our modern-day world. Such, as I see it, is the matter before us today.

In accordance with the foregoing, I would grant the writ of mandamus directing the respondent to issue the bonds pursuant to R.C. 4141.48 on the basis that such bonds do not constitute a debt incurred "by or on behalf of the state" and thus are constitutionally permissible.

LOCHER, J., concurs in the foregoing dissenting opinion.