438 S.E.2d 810

**STATE of West Virginia ex rel. Henry R. MAROCKIE, as State Superintendent of Schools and as President of the School Building Authority of the State of West Virginia, Relator,**

v.

**Charles H. WAGONER, as Secretary of the School Building Authority of the State of West Virginia, Respondent,**

**William S.E. Winkler and Diane Hickle, Intervenors.**

**No. 21952.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 30, 1993.

Decided Dec. 13, 1993.

Victor A. Barone, James K. Brown, Anthony J. Majestro, Jackson & Kelly, Charleston, for relator.

James B. Lees, Jr., Hunt, Lees, Farrell & Kessler, Charleston, for intervenors.

Darrell V. McGraw, Jr., Atty. Gen., Silas Taylor, Sr. Deputy Atty. Gen., Charleston, for respondent.

MILLER, Justice:

In this original proceeding in mandamus, we are asked to determine the validity of certain revenue bonds that were authorized at the 1993 Second Extraordinary Session of

the Legislature.[1] The relator is Henry R. Marockie, the State Superintendent of Schools and President of the School Building Authority of the State of West Virginia (SBA). The respondent is Charles H. Wagoner, who is the secretary of the SBA and whose signature is required in order to begin the process of issuing the bonds. The intervenors are William S.E. Winkler and Diane Hickle, who are citizens and taxpayers of Kanawha County.

These bonds are an outgrowth of our recent opinion in *Winkler v. State of West Virginia School Building Authority*, 189 W.Va. 748, 434 S.E.2d 420 (1993), where we declared unconstitutional certain bonds that were to be issued by the SBA. In Syllabus Point 7, we stated:

> "Revenue bonds authorized under the School Building Authority Act, W.Va.Code, 18–9D–1, *et seq.*, constitute an indebtedness of the State in violation of Section 4 of Article X of the West Virginia Constitution. To the extent that Syllabus Point 3 of *State ex rel. Resource Recovery–Solid Waste Disposal Authority v. Gill*, 174 W.Va. 109, 323 S.E.2d 590 (1984), holds to the contrary, it is overruled."

The Legislature has devised a new method to finance the SBA bonds by amending that portion of our consumer sales tax statute found in W.Va.Code, 11–15–30 (1993), to dedicate a portion of its proceeds to retire the principal and interest of the bonds. There is an annual cap of $12 million on the amount dedicated.[2]

In *Winkler*, the SBA bonds were found to violate Section 4 of Article X of our Constitution,[3] which limits the State's ability to incur debt. This violation occurred because there was no separate source of payment for liquidating the bonds except the general revenue fund.

In order to save the bonds, two related points were urged in *Winkler*. First, reference was made to W.Va.Code, 18–9D–14, which contains language that prevents the SBA from "in any manner ... [pledging] the credit or taxing power of the state" and also language that obligations of the SBA should not "be deemed to be obligations of the state."[4]

Next, it was pointed out that the bond language itself indicated that the Legislature

**1.** This type of proceeding has been the traditional format for this Court to pass on the constitutionality of state bonds in advance of their issuance. *See, e.g., State ex rel. Dep't of Employment Security v. Manchin*, 178 W.Va. 509, 361 S.E.2d 474 (1987); *State ex rel. Ohio County Comm'n v. Samol*, 165 W.Va. 714, 275 S.E.2d 2 (1980).

**2.** W.Va.Code, 11–15–30 (1993), provides:

"Beginning the first day of November, one thousand nine hundred ninety-three, and continuing on the first day of each succeeding month thereafter, there shall be dedicated monthly from the collections of this tax, prior to the payment or commitment of the proceeds or collections of this tax for any other purpose whatsoever, an amount equal to one eighth of the projected annual principal and interest requirements on any and all revenue bonds and refunding bonds issued, or to be issued, on or after the first day of January, one thousand nine hundred ninety-four, for which bond moneys in the school building debt service fund have been pledged, or will be pledged, for repayment pursuant to section six, article nine-d, chapter eighteen of this code, such principal and interest requirements having been certified to the tax commissioner in accordance with the provisions of said section: *Provided,* That in no event shall the total dedicated collections of this tax to be paid into the school

building debt service fund, as provided in this section, in any fiscal year exceed the lesser of the principal and interest requirements certified to the tax commissioner as aforesaid, or twelve million dollars. The amount dedicated shall be deposited on a monthly basis into the school building debt service fund created pursuant to section six, article nine-d, chapter eighteen of this code."

**3.** Section 4 of Article X of the West Virginia Constitution states:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

**4.** The text of W.Va.Code, 18–9D–14, is:

"No provisions of this article shall be construed to authorize the school building authority at any time or in any manner to pledge the credit or taxing power of the state, nor shall any of the obligations or debts created by the school building authority under the authority herein granted be deemed to be obligations of the state."

could appropriate money to retire the bonds, but it was not legally obligated to do so.[5] Consequently, we were asked to hold that because the bonds were not State obligations and the Legislature was not required to fund their retirement, no State debt was created and no violation of Section 4 of Article X would occur. However, we concluded that these disclaimers could not be construed to mean that the Legislature would not fund the bonds:

> "Finally, unless we are to abandon our logic and common sense, we cannot help but conclude that the statutory scheme surrounding these bonds bespeaks a legislative requirement that they be funded.... To accept the premise that the Legislature is not bound to fund the bonds and would allow a default, thereby impairing the credit rating of the State, assumes a naivete on our part that we simply do not possess." 189 W.Va. at 763, 434 S.E.2d at 435. (Citations omitted; footnote omitted).

In *Winkler*, we discussed at some length our prior bond cases. We recognized that there is a class of bonds that is exempt from the debt restrictions contained in Section 4 of Article X of our Constitution. These are bonds issued pursuant to Section 2 of Article XIV of our Constitution that requires voter approval before they can be issued. We summarized this class of bonds in Syllabus Point 3 of *Winkler*:

> "A category of bonds that override the specific limitations contained in Sections 4 and 6 of Article X of the West Virginia Constitution are bonds that the Legislature issues after following the procedures contained in Section 2 of Article XIV of the Constitution relating to constitutional amendments. Under the amendment procedure, a majority of qualified voters vot-

ing on the issue must approve the issuance of the bonds."

■ Another category of bonds that our cases have recognized as not offending the debt limitation contained in Section 4 of Article X is summarized in Syllabus Point 6 of *Winkler*:

> "Section 4 of Article X of the West Virginia Constitution is not designed to prohibit the State or the state's agencies from issuing revenue bonds that are to be liquidated from contracts requiring rental payments from another state agency or from contracts for necessary services such as utilities; nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund."

*Winkler* did not embark upon a detailed analysis of these types of bonds simply because the SBA's bond funding mechanism did not fit into either category.

In the present case, the Legislature has apparently sought to come within the "special fund category" by designating a portion of the consumer sales tax to liquidate the bonds. There is no doubt that, from a historical standpoint, the proceeds of the consumer sales tax have been deposited in the general revenue fund.[6] Indeed, W.Va.Code, 11–15–30 (1992), relating to the consumer sales tax prior to its 1993 amendment, contained this initial statement: "The proceeds of the tax imposed by this article shall be deposited in the general revenue fund of the state[.]"

We dealt with the question of whether the consumer sales tax and the use tax were parts of the general revenue fund or the general school fund in *Board of Education v. Board of Public Works*, 144 W.Va. 593, 109 S.E.2d 552 (1959). In each of these tax statutes, there was a section which stated

---

**5.** Part of the relevant bond language was: "AMOUNTS AVAILABLE TO BE TRANSFERRED TO THE TRUSTEE FOR DEPOSIT IN THE REVENUE FUND ARE SUBJECT TO ANNUAL APPROPRIATION BY THE STATE LEGISLATURE. THE STATE LEGISLATURE IS NOT LEGALLY OBLIGATED TO MAKE APPROPRIATIONS IN AMOUNTS SUFFICIENT TO PAY DEBT SERVICE ON THE BONDS." 189 W.Va. at 753, 434 S.E.2d at 425.

**6.** In the Auditor's annual report entitled "Analysis of Receipts and Expenditures," issued pursuant to W.Va.Code, 12–4–7 (1923), for the fiscal year ending June 30, 1992, the general revenue fund received $569,162,318 from the consumer sales tax. For the fiscal year ending June 30, 1991, the amount was $536,559,245.

that the proceeds of the tax shall be devoted to the support of free schools and expended in the manner as provided by law. Initially, we pointed out that the consumer sales and use taxes were not sources of revenue that are constitutionally dedicated to the school system under Section 4 of Article XII of our Constitution.[7] We then explained that the involved statutory provisions

"are mere legislative directions concerning the use to be made of the proceeds of the tax. Those provisions do not require such proceeds to be paid into the general school fund ... or make such proceeds a part of the general school fund, or constitute an appropriation of such proceeds to the general school fund." 144 W.Va. at 610, 109 S.E.2d at 561–62.

Moreover, we observed from public budget documents that even after the enactment of the subject sections, the revenues from the consumer sales and use taxes had been placed in the general revenue fund. We, therefore, concluded in Syllabus Point 6 of *Board of Education, supra:*

"The revenue derived from the consumers sales tax and the use tax is a part of the general revenue fund and as such is subject to the provisions of Section 35, Article 5, Chapter 5, Code, 1931, as amended."

The question in this case then becomes whether the Legislature can dedicate taxes that historically have gone into the general revenue fund to create a separate fund to retire SBA revenue bonds. We believe that it cannot without violating the debt strictures of Section 4 of Article X.

Our cases have emphasized that a special fund to retire bonds cannot come from exist-ing taxes that are deposited in the general revenue fund. For instance, in *State ex rel. State Building Commission v. Moore,* 155 W.Va. 212, 184 S.E.2d 94 (1971), we approved legislation that directed the liquor commissioner to increase the profits from the sale of intoxicating liquors "to pay $3,600,000 annually into the special fund created for the purpose of paying the principal of and the interest on the 'State Building Revenue Bonds.'" 155 W.Va. at 234, 184 S.E.2d at 106. Our rationale was that this money was not a part of the current tax stream that flowed into the general revenue fund: "Unlike other statutes which heretofore have been held by this Court to create state debts in violation of the constitutional provision in question, the 1971 Act does not deal with funds arising from general revenue appropriations or from any tax, excise or otherwise, imposed by law upon taxpayers." 155 W.Va. at 234, 184 S.E.2d at 106.

▮ In *Moore,* we also quoted at some length from *State ex rel. Board of Governors of West Virginia University v. O'Brien,* 142 W.Va. 88, 96–97, 94 S.E.2d 446, 451 (1956), where this language is found: "'No taxes or properties of the State are pledged or in any way made liable for the payment of the bonds. As already made clear, a debt to be paid in such manner does not constitute a debt within the meaning of that constitutional provision.'" 155 W.Va. at 232, 184 S.E.2d at 106. (Italics omitted). The teaching of these two cases makes it clear that the Legislature may not designate funds that will be used to liquidate a revenue bond issue out of a current tax source that flows into the general revenue fund. If this practice were permitted, then a debt would be created that

---

7. The relevant portion of Section 4 of Article XII is:

"The existing permanent and invested school fund, and all money accruing to this State from forfeited, delinquent, waste and unappropriated lands; and from lands heretofore sold for taxes and purchased by the state of Virginia, if hereafter redeemed or sold to others than this State; all grants, devises or bequests that may be made to this State, for the purposes of education or where the purposes of such grants, devises or bequests are not specified; this State's just share of the literary fund of Virginia, whether paid over or otherwise liquidated; and any sums of money, stocks or property which this State shall have the right to claim from the state of Virginia for educational purposes; the proceeds of the estates of persons who may die without leaving a will or heir, and of all escheated lands; the proceeds of any taxes that may be levied on the revenues of any corporations; all moneys that may be paid as an equivalent for exemption from military duty; and such sums as may from time to time be appropriated by the legislature for the purpose, shall be set apart as a separate fund, to be called the 'school fund[.]'"

would burden the existing general revenue fund in violation of Section 4 of Article X of our Constitution.

 However, if the Legislature creates a new tax source or increases the amount to be paid on an existing tax account, this new or increased amount may be used to liquidate revenue bonds. The Legislature also may utilize an existing special revenue source to liquidate revenue bonds so long as that source of funds has not gone into the general revenue fund.[8] In these situations, the financial integrity of the State's existing tax structure has not been impaired because there is a new revenue source to liquidate the bonds. Thus, the bonds do not represent an increased burden on the State's existing indebtedness in violation of Section 4 of Article X of the West Virginia Constitution. See Justice Neely's policy statements in his concurring opinion in *Winkler v. Sate of West Virginia School Building Authority*, 189 W.Va. at 766, 434 S.E.2d at 438.

The foregoing law was the rationale behind our approval of revenue bonds whose refunding relied on additional revenue generated by increasing the rate of unemployment taxes to be paid by both employers and employees in *State ex rel. Department of Employment Security v. Manchin*, 178 W.Va. 509, 361 S.E.2d 474 (1987). There, we concluded in Syllabus Point 4:

> "The authority vested in the Commissioner of the Department of Employment Security under *W.Va.Code*, 21A–8A–8 [1987] to impose an assessment up to a maximum amount set forth in that *Code* section upon employers and employees for the purpose of retiring bonds issued under 'The Debt Fund Act' of 1987 is not an unconstitutional delegation of power by the Legislature to an executive officer."

Other states have reached much the same conclusion when construing their constitutional debt limitation provision. For example, the Ohio Supreme Court in *State ex rel. Shkurti v. Withrow*, 32 Ohio St.3d 424, 513 N.E.2d 1332 (1987), reiterated this principle, quoting from its earlier decision in *State ex rel. Public Institutional Building Authority v. Neffner*, 137 Ohio St. 390, 399, 19 O.O. 112, 115, 30 N.E.2d 705, 709 (1940):

> " 'Where substantial funds which have heretofore gone into the general funds of the state treasury are pledged to liquidate such bonds, thereby requiring the state to seek and secure revenues otherwise in order to meet its obligations to care for and support its wards, then the obligation of those bonds does become the ultimate obligation of the state. To hold otherwise would result in an evasion of the constitutional limitations.' " 32 Ohio St.3d at 427–428, 513 N.E.2d at 1336.[9]

In *Shkurti*, the court found the bonds unconstitutional because there was no new or additional revenue source for their repayment.

Much the same result was reached by the Oregon Supreme Court in *In the Matter of the Constitutionality of Chapter 280, Oregon Laws 1975*, 276 Or. 135, 143, 554 P.2d 126,

---

8. An illustration of this type of tax source is the proceeds used from the State Lottery. Under W.Va.Code, 29–22–18(f) (1990): "Annually, the Legislature shall appropriate all of the amounts allocated as net profits ... to (1) the lottery education fund ..., (2) the lottery senior citizens fund ..., and (3) the commerce division [division of tourism and parks[.]" Under W.Va.Code, 29–22–18(g) and –18(h), the treasurer is required to establish two special accounts to receive the lottery education funds and the lottery senior citizens funds. Under W.Va.Code, 29–22–18(i), the division of tourism and parks receives the lottery money directly to be used for the purposes described therein. In W.Va.Code, 29–22–18(g), this language is found as to the distribution of the lottery education fund:

"The revenues received or earned by the lottery education fund shall be disbursed in the manner provided below and shall not be treated by the auditor and treasurer as part of the general revenue of the state. Annually, the Legislature shall appropriate the revenues received or earned by the lottery education fund to the state system of public and higher education for such educational programs as it considers beneficial to the citizens of this state."

This same language which forecloses these proceeds from being a part of the general revenue fund is found in W.Va.Code, 29–22–18(h), relating to the lottery senior citizens fund.

9. In *Neffner*, the bonds were to be used to construct, equip, and improve state mental institutions. These bonds were to be liquidated by general revenue funds given to the Department of Public Welfare.

130 (1976), when it invalidated a revenue bond proposal:

> "However, where, as here, the revenue for bond payment comes from the general fund of the state and is not generated from charges by the state to third parties for facilities or services, the rationale exempting revenue bonds from the constitutional restriction is obviously inapplicable. The state no longer acts as a conduit, but rather it has directly obligated general tax revenues to sustain the fund for bond payment."

The Supreme Court of Michigan in *In re Advisory Opinion, Constitutionality of P.A. 1 & 2*, 390 Mich. 166, 211 N.W.2d 28 (1973), faced an analogous situation where the State's bond funding proposal ultimately required the State to pay any deficiency in retiring the bonds by utilizing funds from the State's sales tax revenues. The court began by noting that sales tax revenues were part of the general revenue fund. It then framed the issue as follows: "[W]e are now asked to hold that henceforth the State can incur indebtedness as long as it withholds its full faith and credit and has limited repayment to a carved-out portion of general tax revenues set aside and called a special fund." 390 Mich. at 178, 211 N.W.2d at 32. Without any extended discussion, the court concluded that the bond funding plan violated Michigan's constitutional indebtedness restriction.

The New Mexico Supreme Court in *State Office Building Commission v. Trujillo*, 46 N.M. 29, 120 P.2d 434 (1941), upheld the validity of a lease rental arrangement in a state office building for state agencies. The rental payments were used to refund bonds issued by its Office Building Commission, whose proceeds were used to construct the building. The court gave this summary of the special fund doctrine:

> "[I]t means that thereby and thereunder any financial obligation of the state, not otherwise constitutionally objectionable, is valid without approval of the electorate if it is to be paid for and discharged in full from moneys derived from sources other than from general taxation ...; and to show that for such an obligation to come under the special fund doctrine, the creation of the obligation and the law authorizing it must specify and set out the sources for payment thereof and thereby disclose that no part of the payment is to be obtained from general taxation." 46 N.M. at 45–46, 120 P.2d at 444.

■ Here, as we have earlier observed, no special fund is created except that which already exists in the general revenue fund. Consequently, we conclude that the SBA bonds that are to be liquidated by dedicating a portion of the existing consumer sales tax, which is a general revenue fund tax, create new debt and, therefore, violate Section 4 of Article X of our Constitution.

A second argument advanced by the SBA to uphold the bonds is that the dedicated payments from the consumer sales tax come within the purview of Section 6a of Article X of our Constitution. This section allows the Legislature to "impose a state tax or taxes or dedicate a state tax or taxes or any portion thereof for the benefit of and use by counties, municipalities or other political subdivisions of the State[.]" [10] The obvious answer to this assertion is that the SBA is not a political subdivision, but is a State agency. Therefore, it does not fall within the plain language of Section 6a of Article X of the West Virginia Constitution.

---

10. The full text of Section 6a of Article X is: "Notwithstanding the provisions of section six of this article, (1) the legislature may appropriate state funds for use in matching or maximizing grants-in-aid for public purposes from the United States or any department, bureau, commission or agency thereof, or any other source, to any county, municipality or other political subdivision of the State, under such circumstances and subject to such terms, conditions and restrictions as the legislature may prescribe by law, and (2) the legislature may impose a state tax or taxes or dedicate a state tax or taxes or any portion thereof for the benefit of and use by counties, municipalities or other political subdivisions of the State for public purposes, the proceeds of any such imposed or dedicated tax or taxes or portion thereof to be distributed to be counties, municipalities or other political subdivisions of the State under such circumstances and subject to such terms, conditions and restrictions as the legislature may prescribe by law."

We have not had occasion to explicitly state that Section 6a of Article X does not apply to the State or State agencies. In *Boggs v. Board of Education,* 161 W.Va. 471, 475, 244 S.E.2d 799, 802 (1978), *overruled on other grounds, Ohio Valley Contractors v. Board of Educ.,* 170 W.Va. 240, 293 S.E.2d 437 (1982), we mentioned that *"W.Va. Const. art. 10, § 6a,* is a practical way to give West Virginia citizens the benefit of numerous federal programs[.]" Furthermore, in *State ex rel. Kanawha County Building Commission v. Paterno,* 160 W.Va. 195, 233 S.E.2d 332 (1977), we used Section 6a of Article X to validate the Legislature's enactment of the coal severance tax, W.Va.Code, 11–13–1, *et seq.,* whose proceeds were distributed to the various counties and municipalities. In *Paterno,* we said that Section 6a "modifies the state debt, state credit and county debt provisions[.]" 160 W.Va. at 203, 233 S.E.2d at 337.

We did recognize in *Winkler, supra,* the different applicability between Section 4 and Section 6 of Article X of our Constitution. We said the "restrictions contained in Section 4 of Article X deal with the creation of long-term debt by the State or its agencies through revenue bonds[.]" 189 W.Va. at 755, 434 S.E.2d at 427. On the other hand, Section 6 of Article X was found to be a restriction on the State's aid to counties, municipalities, corporations, or persons.[11] As we held in Syllabus Point 5 of *Winkler, supra:*

> "The plain language of Section 6 of Article X of the West Virginia Constitution is designed to restrict the State from granting credit to subordinate political subdivisions such as municipalities and counties, as well to forbid the State from granting credit or assuming liabilities for debts of private persons or other entities."

■ Obviously, Section 6a of Article X was designed to allow exemptions to the limitations imposed in Section 6 of Article X. Its introductory language clearly compels this conclusion as it states "[n]otwithstanding the provisions of section six of this article[.]" Section 6a of Article X of our Constitution has no language that would make it applicable to a State agency's funding of revenue bonds. Consequently, we conclude that Section 6a of Article X of our Constitution applies to counties, municipalities, or other political subdivisions. It does not apply to the State or its agencies. There can be no dispute that the SBA is a State agency.[12]

Because we conclude that the SBA bonds at issue in this case violate Section 4 of Article X of our Constitution, we decline to issue the writ of mandamus.

Writ denied.

---

**11.** Section 6 of Article X of the West Virginia Constitution states:

"The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

**12.** Originally, under W.Va.Code, 18–9D–1 (1988), when the SBA was created, its powers were placed with the State Board of Education. Thereafter, under W.Va.Code, 18–9D–1 (1989), the SBA became a separate entity with a designated membership of the State Superintendent of Schools, *ex officio,* and three members of the State Board of Education. Citizen members are appointed by the Governor with the advice and consent of the Senate. W.Va.Code, 18–9D–3 (1993), defines the powers of the SBA to include the right to sue and be sued.