446 S.E.2d 680

**STATE of West Virginia ex rel. Henry R. MAROCKIE, State Superintendent of Schools and President of the West Virginia School Building Authority, Petitioner,**

v.

**Charles H. WAGONER, Secretary of the West Virginia School Building Authority, Respondent.**

**No. 22214.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1994.

Decided June 15, 1994.

Victor A. Barone, James K. Brown, Anthony J. Majestro, Jackson & Kelly, Charleston, for petitioner.

Darrell V. McGraw, Jr., Atty. Gen., Dawn E. Warfield, Deputy Atty. Gen., Charleston, for respondent.

McHUGH, Justice:

The petitioner, Henry R. Marockie, as State Superintendent of Schools and President of the School Building Authority of West Virginia (hereinafter "SBA"), seeks a writ of mandamus to compel Dr. Charles H. Wagoner, as the SBA Board Secretary, to provide notice of a special meeting of the Board of the SBA called by the petitioner for the purpose of acting upon resolutions authorizing the issuance of the revenue bonds authorized in Enrolled Senate Bill No. 1008 passed on March 18, 1994, in the First Extraordinary Session of the 71st Legislature. For reasons set forth below, we issue a writ of mandamus.

I

This is the third case in the continuing saga of the issuance of school revenue bonds by the SBA. The SBA states that it finances the construction and maintenance of public school facilities through the issuance of revenue bonds. Prior to July 22, 1993, the bonds issued by the SBA were secured by a fund which was made up of discretionary annual appropriations by the legislature from general tax revenue. This funding mechanism was declared unconstitutional in *Winkler v. State of West Virginia School Building Authority,* 189 W.Va. 748, 434 S.E.2d 420 (1993).

In response to *Winkler* the legislature devised another funding mechanism. The legislature used a portion of the consumers sales tax proceeds to repay the revenue bonds. However, this Court found that the use of the consumers sales tax to repay the bonds also violated *West Virginia Constitution* art. X, § 4 since the consumers sales tax is a general revenue fund tax. Syl. pt. 4, *State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 438 S.E.2d 810 (1993).

In response to *Marockie* the legislature devised yet another funding mechanism. The legislature, in the First Extraordinary Session, enacted Enr.S.B. No. 1008, (hereinafter "S.B. 1008"), on March 18, 1994, on which date the amendments authorized by

S.B. 1008 became effective. S.B. 1008 creates a special fund, named the school building debt service fund, which consists of monies allocated from the net profits of the West Virginia Lottery, to liquidate the revenue bonds.

More specifically, S.B. 1008 amends *W.Va. Code,* 18–9D–6(b) to state, in relevant part:

There is hereby created in the state treasury a special fund named the school building debt service fund into which shall be deposited on and after the first day of April, one thousand nine hundred ninety-four, the amounts specified in section eighteen, article twenty-two, chapter twenty-nine of this code. All amounts deposited in the fund shall be pledged to the repayment of the principal, interest and redemption premium, if any, on any revenue bonds or refunding revenue bonds authorized by this article[.]

Additionally, S.B. 1008 amends *W.Va.Code,* 29–22–18(h) to state, in relevant part:

Beginning on or before the twenty-eighth day of July, one thousand nine hundred ninety-four, and continuing on or before the twenty-eighth day of each succeeding month thereafter through the thirtieth day of June, two thousand five, the lottery director shall allocate to the school building debt service fund created pursuant to the provisions of section six, article nine-d, chapter eighteen of this code, as a first priority from the net profits of the lottery for the preceding month, an amount equal to one tenth of the projected annual principal, interest and coverage ratio requirements on any and all revenue bonds and refunding bonds issued, or to be issued, on or after the first day of April, one thousand nine hundred ninety-four, as certified to the lottery director in accordance with the provisions of said section[.]

The petitioner called a special meeting of the board of the SBA for April 29, 1994, in order to act upon resolutions authorizing the issuance of the revenue bonds under S.B. 1008. In order to comply with the notice of meeting requirements of the by-laws, the petitioner in a letter directed the respondent, as SBA board secretary, to give notice of the

special meeting. The respondent refused to give notice of any meeting called for the purpose of issuing bonds. The respondent raises five issues in this proceeding which will be discussed below.

## II

■ The first issue we will address is whether the provisions providing for the issuance of revenue bonds by the SBA, as amended by S.B. 1008, violate *W.Va. Const.* art. X, §§ 4, and 6.[1] For reasons explained below, we find that the mechanism described in S.B. 1008 for funding school bonds does not violate *W.Va. Const.* art. X, § 4.[2]

■ We stated in syllabus point 1 of *Marockie, supra* that:

'Section 4 of Article X of the West Virginia Constitution is not designed to prohibit the State or the state's agencies from issuing revenue bonds that are to be liquidated from contracts requiring rental payments from another state agency or from contracts for necessary services such as utilities; nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund.' Syllabus Point 6, *Winkler v. State of West Virginia School Bldg. Authority,* 189 W.Va. 748, 434 S.E.2d 420 (1993).

Furthermore, we explained what funding mechanisms were constitutional in syllabus point 3 of *Marockie, supra:*

If the Legislature creates a new tax source or increases the amount to be paid on an existing tax account, this new or increased amount may be used to liquidate revenue bonds. The Legislature may also utilize an existing special revenue source to liquidate revenue bonds so long as that source of funds has not gone into the general revenue fund. In these situations, the financial integrity of the State's existing tax structure has not been impaired because there is a new revenue source to liquidate the bonds. Thus, the bonds do not represent an increased burden on the State's existing indebtedness in violation of Section 4 of Article X of the West Virginia Constitution.

The petitioner contends that the legislature did use an existing special revenue source which has not gone into the general revenue fund when it dedicated monies from the state lottery to retire the revenue bonds. The petitioner correctly points out that in *Marockie* when discussing the use of an existing special revenue source which has not gone into the general revenue fund this Court noted that an illustration of this funding source would be proceeds from the state lottery. *Id.* at 472 n. 8, 438 S.E.2d at 815 n. 8. This Court based its opinion on the following language found in *W.Va.Code,* 29–22–18(g) [1990], in pertinent part:

The revenues received or earned by the lottery education fund shall be disbursed in the manner provided below and *shall not be treated by the auditor and treasurer as part of the general revenue of the state.* Annually, the Legislature shall appropriate the revenues received or earned by the lottery education fund to the state system of public and higher education for such

1. *W.Va. Const.* art. X, § 4 states:

No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years.
*W.Va. Const.* art. X, § 6 states:
The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter be-

come a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever.

2. *W.Va. Const.* art. X, § 6 is not at issue here. In syllabus point 5 of *Winkler, supra,* we outlined when *W.Va. Const.* art. X, § 6 applies:

The plain language of Section 6 of Article X of the West Virginia Constitution is designed to restrict the State from granting credit to subordinate political subdivisions such as municipalities and counties, as well to forbid the State from granting credit or assuming liabilities for debts of private persons or other entities.
This is not the situation we have before us in this case.

educational programs as it considers beneficial to the citizens of this state. (emphasis added). *See Id.*[3]

The logic behind allowing the legislature to use an existing special revenue source to retire the bonds, but not allowing the legislature to use revenue from the consumers sales tax was succinctly stated in *State ex rel. State Building Commissioner v. Moore*, 155 W.Va. 212, 234, 184 S.E.2d 94, 107 (1971):

Taxes are paid under legal compulsion and, in that sense, they are paid involuntarily. Profits accruing from the sale of alcoholic liquors by the state arise, not from the general public in the form of taxation, but rather from the action of the members of the public who, on a wholly voluntarily basis, purchase alcoholic liquors from the state.

Likewise, profits accruing from the lottery are from the public, who voluntarily purchase lottery tickets.

■ The respondent, however, contends that the general revenue will still be affected since the legislature simply shifted programs which were originally paid for by lottery proceeds to other revenue sources, including the general revenue. In *State ex rel. The Board of Governors of West Virginia University v. O'Brien*, 142 W.Va. 88, 94 S.E.2d 446 (1956), this Court was faced with a similar question.

In *O'Brien* the Board of Governors of West Virginia University wanted to use a special fund to retire bonds which would be used to construct buildings for the college of agriculture, the agriculture experiment station, the agriculture extension division, the college of engineering, the engineering experiment station and the school of mines at West Virginia University. The special fund consisted of monies allocated from student fees. The Secretary of State argued that

part of the revenue required to be paid into the special fund had previously been applied to the maintenance and operation of existing facilities belonging to the university. Therefore, additional revenue would be required to be raised by taxation in order to continue the maintenance and operation of the university. *Id.*

This Court noted the question before it was not easily answered, but concluded that any doubt must be resolved in favor of the constitutionality of the statute and that great weight should be accorded to the action of a coordinate branch of government. Based on the above rationale, this Court found that an unconstitutional debt was not created by the use of a special fund. Implicit in that decision is the fact that additional funding would have to be created in order to fund those projects which had been previously funded by revenue which would be going to the special fund. *Id.* *O'Brien* makes it clear that the important question is whether the funding for the bonds creates an unconstitutional debt, not how will other projects originally funded by the special fund continue to be funded.

Additionally, the respondent points out that in fiscal years 1986–89 the lottery net profits were transferred to the general revenue of the State. Therefore, the respondent contends that historically the lottery funds have been made a part of the general revenue fund. However, as the respondent acknowledges, since 1990 the profits have not been made part of the general revenue fund, but instead have been allocated to purposes set forth in *W.Va.Code*, 29–22–18(f) [1990]: (1) the lottery education fund; (2) the lottery senior citizens fund and (3) the commerce division (division of tourism and parks).[4]

---

**3.** The lottery education fund was created in 1989. *See Acts of the Legislature of West Virginia*, Regular Session of the 69th Legislature, 1989, chapter 117. *W.Va.Code*, 29–22–18(g) [1990] states, in part, that "[a]nnually, the Legislature shall appropriate the revenues received or earned by the lottery education fund to the state system of public and higher education for such educational programs as it considers beneficial to the citizens of this state." Although *W.Va. Code*, 29–22–18 was amended by S.B. 1008, the lottery education fund remains in existence. There is nothing before us which indicates that

the lottery education fund has been used to fund school revenue bonds. In S.B. 1008 the legislature created a separate fund known as the school building debt service fund which is to fund the school revenue bonds. *See W.Va.Code*, 29–22–18 [1994].

**4.** *W.Va.Code*, 29–22–18 was amended in S.B. 1008 to state that the net profits from the lottery would be dedicated to the following: (1) the school building debt service fund; (2) the lottery education fund; (3) the school construction fund;

Furthermore, the legislature was very clear when it stated that the "revenues received or earned by the lottery education fund ... shall not be treated ... as part of the general revenue of the state." *W.Va.Code*, 29–22–18(g) [1990], in relevant part. Additionally, the language which states that the lottery revenues are not to be treated as part of the general revenue of the State remains in *W.Va.Code*, 29–22–18 even after it was amended by S.B. 1008.

■ Lastly, the respondent contends that the revenue from the lottery is constantly changing so there is no guarantee that the profits will support the amount needed yearly to fund debt service. The respondent argues that if the profits fell short, the legislature could be forced to appropriate funds from the general revenue for debt service, thus violating the constitution.

In the event that the lottery profits would be insufficient to pay the debt service on the bonds, the legislature amended *W.Va.Code*, 29–22–18 in S.B. 1008 to address this issue. *W.Va.Code*, 29–22–18(h) [1994], as found in S.B. 1008, states, in pertinent part:

That in the event there are insufficient funds available in any month to transfer the amount required to be transferred pursuant to this subsection to the school debt service fund, the deficiency shall be added to the amount transferred in the next succeeding month in which revenues are available to transfer said deficiency: *And provided further,* That a lien on the proceeds of the state lottery fund up to a maximum amount equal to the projected annual principal, interest and coverage ratio requirements, not to exceed twenty-seven million dollars annually, may be granted by the authority in favor of the bonds issued by the authority which are secured by the net lottery profits.

The legislature has taken steps to insure that the debt service on the school revenue bonds will not be paid out of the general revenue fund.

In summary, the school building debt service fund, described in *W.Va.Code*, 29–22–18 [1994] as consisting of monies allocated from (4) the lottery senior citizens fund; and (5) the

the net profits of the West Virginia Lottery, may be used to liquidate the School Building Authority's revenue bonds. This method of funding the School Building Authority's revenue bonds does not violate section 4 of article X of the *West Virginia Constitution* since the monies allocated to the school building debt service fund are a new revenue source and since the legislature specifically provided in *W.Va.Code*, 29–22–18 [1990 and 1994] that the net profits from the West Virginia Lottery are not to be treated as part of the general revenue of the State.

### III

The second issue is whether the enactment of S.B. 1008 by the legislature was in compliance with *W.Va. Const.* art. VI, § 29 which prescribes the requirements for the reading of legislative bills. *W.Va. Const.* art. VI, § 29 states:

No bill shall become a law, until it has been fully and distinctly read, on three different days, in each house, unless, in case of urgency, by a vote of four fifths of the members present, taken by yeas and nays on each bill, this rule be dispensed with: Provided, in all cases, that an engrossed bill shall be fully and distinctly read in each house.

In the case before us, there was a four-fifths vote to suspend the constitutional rule in both houses. Therefore, the above constitutional provision requires that the engrossed bill be read once in each house. The respondent agrees that the engrossed bill was read once in each house.

■ In syllabus point 5 of *State ex rel. Heck's Discount Centers, Inc. v. Winters,* 147 W.Va. 861, 132 S.E.2d 374 (1963), this Court stated the following:

'A bill duly enrolled, authenticated, and approved is presumed to have been passed by the Legislature in conformity with the requirements of the Constitution, unless the contrary affirmatively appears from the journal of either house or other legislative records; and the failure of the Legislature to comply with constitutional re-

commerce division.

quirements in its enactment, which can be considered only when disclosed by ambiguity, omission or conflict in such journal or other legislative records, must be clearly and convincingly established to overcome such presumption.' *State v. Heston,* Point 3 Syllabus, 137 W.Va. 375[, 71 S.E.2d 481 (1952).]

Simply put, this Court has held that there is a presumption that the legislature followed the constitutional rules when enacting legislation.

■ The respondent suggests that since the journals only list the title of the bill and do not clearly indicate that the bill was read in its entirety, then there is no proof that the Senate and House of Delegates did not violate *W.Va. Const.* art. VI, § 29. However, there is nothing before us which indicates that the bill was not read. We fail to see the logic behind requiring the journals to list more than the titles to indicate that the bill is read. If the journals state that the bill was read, then unless there is affirmative proof to the contrary, we will presume the legislature followed the requirements of *W.Va. Const.* art. VI, § 29. Accordingly, we hold that the facts before us do not indicate that there was a violation of *W.Va. Const.* art. VI, § 29.

### IV

The third issue is whether S.B. 1008 conformed to the requirements of *W.Va. Const.* art. VI, § 30. *W.Va. Const.* art. VI, § 30 states:

No act hereafter passed, shall embrace more than one object, and that shall be expressed in the title. But if any object shall be embraced in an act which is not so expressed, the act shall be void only as to so much thereof, as shall not be so expressed, and no law shall be revived, or amended, by reference to its title only; but the law revived, or the section amended, shall be inserted at large, in the new act. And no act of the legislature, except such as may be passed at the first session under this Constitution, shall take effect until the expiration of ninety days after its passage, unless the legislature shall by a vote of two thirds of the members elected to each house, taken by yeas and nays, otherwise direct.

■ The respondent contends that the title of S.B. 1008 does not advise the reader of the subject matter of the bill. In syllabus points 1 and 2 of *State ex rel. Walton v. Casey,* 179 W.Va. 485, 370 S.E.2d 141 (1988), this Court explained how to determine whether the title of an act sufficiently indicates the subject matter of an act:

1. W.Va. Const. art. VI, § 30, which requires that the object of an act of the Legislature 'shall be expressed in the title,' serves two salutary purposes. First, it is designed to give notice by way of the title of the contents of the act so that legislators and other interested parties may be informed of its purpose. Second, it is designed to prevent any attempt to surreptitiously insert in the body of the act matters foreign to its purpose which, if known, might fail to gain the consent of the majority.

2. The requirement of expressiveness contemplated by W.Va. Const. art. VI, § 30 necessarily implies explicitness. A title must, at a minimum, furnish a 'pointer' to the challenged provision in the act. The test to be applied is whether the title imparts enough information to one interested in the subject matter to provoke a reading of the act.

■ A portion of the title of S.B. 1008 states that the code sections which are being amended "all [relate] to dedicating lottery net profits for debt service on bonds issued by the school building authority...."[5]

---

5. S.B. 1008 is described as being

AN ACT to repeal section thirty-a, article fifteen, chapter eleven of the code of West Virginia, one thousand nine hundred thirty-one, as amended; to amend and reenact section three, article one, chapter five-g of said code; to amend and reenact section thirty, article fifteen, chapter eleven of said code; to amend and reenact sections two, three, four, six, eight, fifteen and sixteen, article nine-d, chapter eighteen of said code; and to amend and reenact section eighteen, article twenty-two, chapter twenty-nine of said code, all relating to dedicating lottery net profits for debt service on bonds issued by the school building authority; dedicating consumers sales tax proceeds

Clearly, this would advise the reader of the nature of the bill. Additionally, a reading of S.B. 1008 does not reveal that any matters which were unrelated to the purpose of S.B. 1008 were included.

Further, the respondent contends that the bill embraces more than one object since it amends *W.Va.Code,* 5G–1–3 to require an in-state vendor preference for architectural and engineering services for SBA projects. The respondent argues that this is unrelated to funding school construction projects.

■■■■■ In syllabus point 2 of *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993), this Court stated:

If there is a reasonable basis for the grouping of various matters in a legislative bill, and if the grouping will not lead to logrolling or other deceiving tactics, then the one-object rule in *W.Va. Const.* art. VI, § 30 is not violated; however, the use of an omnibus bill to authorize legislative rules violates the one-object rule found in *W.Va. Const.* art. VI, § 30 because the use of the omnibus bill to authorize legislative rules can lead to logrolling or other deceiving tactics.

We find that there is a reasonable basis for the grouping of the various matters in S.B. 1008. Certainly, providing an in-state vendor preference for architectural and engineering services for SBA projects is related to the construction and maintenance of schools. Additionally, we do not find anything in S.B. 1008 which indicates that the matters addressed will lead to logrolling or other deceiving tactics. Accordingly, we do not find that S.B. 1008 violates *W.Va. Const.* art. VI, § 30.

## V

The fourth issue is whether the enactment of S.B. 1008 in the Extraordinary Session of the 1994 Legislature exceeded the scope of the governor's proclamation calling the legis-lature into the extraordinary session in violation of *W.Va. Const.* art. VII, § 7. *W.Va. Const.* art. VII, § 7 states: "The governor may, on extraordinary occasions convene, at his own instance, the legislature; but when so convened it shall enter upon no business except that stated in the proclamation by which it was called together."

■■■ In syllabus point 1 of *State Road Commission of West Virginia v. West Virginia Bridge Commission,* 112 W.Va. 514, 166 S.E. 11 (1932), this Court expounded on *W.Va. Const.* art. VII, § 7: "Under Constitution, Article VII, section 7, the Legislature shall enter upon no business at an extraordinary session except that stated in the proclamation convening it. The proclamation may suggest means of accomplishing the business, but it cannot prescribe or limit the manner in which the Legislature may act." The respondent argues that since the governor did not specifically request legislation or a resolution authorizing the issuance of bonds by the SBA, then the legislature exceeded its purpose by providing legislation on that topic.

■■■ In the case before us, one of the items the governor included for consideration in the extraordinary session was the following: "Legislation to provide for the funding of the construction, renovation and improvement of school facilities." Certainly, the issuance of revenue bonds authorized by S.B. 1008 is related to the "construction, renovation and improvement of school facilities." Accordingly, we hold that *W.Va. Const.* art. VII, § 7 has not been violated.

## VI

The fifth issue is whether the provisions of *W.Va.Code,* 18–9D–1, *et seq.,* as amended by S.B. 1008 are an unconstitutional delegation of power in violation of *W.Va. Const.* art. VI, § 1. *W.Va. Const.* art. VI, § 6 states, in

and authorizing appropriations by the Legislature of lottery revenues for school construction projects; creating the school building debt service fund for the deposit of dedicated lottery revenues; creating the school construction fund and the school major improvement fund for the deposit of dedicated consumers sales tax and appropriated lottery revenues; provid-ing for the transfer of funds to the school building authority custodial account from specified funds in the state treasury; and limiting the permissible expenditures from the school building capital improvements fund, the school building debt service fund, the school construction fund and the school major improvement fund.

relevant part: "The legislative power shall be vested in a senate and house of delegates."

The respondent argues that the provisions in S.B. 1008 are an unlawful delegation to the SBA of legislative powers since they authorize the SBA, in its own discretion, to issue bonds and in what amounts, and to determine which projects are funded. The respondent cites to *State ex rel. W. Va. Housing Development Fund v. Waterhouse,* 158 W.Va. 196, 212, 212 S.E.2d 724, 733 (1974) (citation omitted) which states that "the legislature, when delegating discretionary power, must set forth adequate standards ..." for the exercise of that power.

The petitioner points out that the legislature did provide the SBA adequate guidance to determine how to distribute the proceeds from the revenue bonds in *W.Va. Code,* 18–9D–15 as amended by S.B. 1008. As we stated in syllabus point 5 of *State ex rel. W. Va. Housing Development Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969): " 'The delegation by the legislature of broad discretionary powers to an administrative body, accompanied by fitting standards for their exercise, is not of itself unconstitutional.' Point 8 Syllabus, *Chapman v. Huntington, West Virginia, Housing Authority,* 121 W.Va. 319[, 3 S.E.2d 502 (1939) ]." Furthermore, the petitioner points out the following:

> 'Thus, the rule is that in order that a court may be justified in holding a statute unconstitutional as a delegation of legislative power, it must appear that the power involved is purely legislative in nature—that is, one appertaining exclusively to the legislative department. * * *. Purely legislative power, which can never be delegated, has been described as the authority to make a complete law—complete as to the time when it shall take effect and as to whom it shall be applicable—and to determine the expediency of its enactment.' 16 Am.Jur.2d, Constitutional Law, Section 242, pages 493–94.

*Id.* at 649–50, 171 S.E.2d at 553. This Court went on to state in *Copenhaver* that the authority given to the Board of Directors of the West Virginia Housing Development Fund (hereinafter "Fund") to execute certain contracts did not give the Fund "any purely legislative authority." *Id.* at 650, 171 S.E.2d at 553. This Court explained that the legislature did give the Fund the power "to exercise a degree of discretion or judgment in determining who are 'persons and families of low and moderate income.' " *Id.* However, that power was given out of necessity and given with sufficient guidelines to guide the Fund in its exercise of discretion.

The situation before us today is similar to the situation in *Copenhaver.* The legislature did not give the SBA purely legislative functions; however, the legislature out of necessity gave the SBA certain discretionary powers and provided sufficient guidelines to guide the SBA in its exercise of discretion. Accordingly, we hold that *W.Va.Code,* 18–9D–1, *et seq.,* as amended in S.B. 1008, does not violate *W.Va. Const.* art. VI, § 1.

### VII

Lastly, we address whether the issuance of a writ of mandamus is the proper remedy in the case before us. In syllabus point 2 of *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969), this Court stated:

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

It is well established that "public officers, or boards of officers, may maintain proceedings in mandamus to compel other officers to perform ministerial acts, which come within the scope of their supervision or which are necessary to be performed in order to enable such officer or board to perform its own duties." *State ex rel. Board of Education v. Cavendish,* 81 W.Va. 266, 266–67, 94 S.E. 149, 149 (1917) (citations omitted). The president of the SBA has the authority to call a special meeting. *By–Laws of the School Building Authority of West Virginia,* art. III, § 5 (1991). Additionally, the secretary of the SBA has a ministerial duty to give notice of any regular or special meeting.

By–Laws of the School Building Authority of West Virginia, art. III, § 6 (1991). Therefore, the petitioner had the right to request the respondent to provide notice of the April 29, 1994, meeting.

Furthermore, based on our holding today, the petitioner is entitled to call the meeting in order to issue the bonds authorized by S.B. 1008. Since there is no other adequate remedy to compel the secretary of the SBA to give notice of the special meeting and since the secretary of the SBA had a duty to comply with the petitioner's request, we find that mandamus is the proper remedy.

Writ granted.