453 S.E.2d 612

**STATE of West Virginia ex rel. James LAWRENCE, Commissioner of the West Virginia Division of Tourism and Parks, Petitioner,**

v.

**Chuck POLAN, Cabinet Secretary, Department of Administration, Respondent.**

No. 22590.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 29, 1994.

Decided Dec. 12, 1994.

Stephen Stockton, Asst. Atty. Gen., Charleston, for petitioner.

Dawn Warfield, Sr. Asst. Atty. Gen., Charleston, for respondent.

MILLER, Justice: [1]

In this original proceeding in mandamus, the respondent, Chuck Polan, Secretary of the West Virginia Department of Administration, questions the legality of revenue bonds that the petitioner, James Lawrence, Commissioner of the West Virginia Division of Tourism and Parks (Commissioner), wants to issue pursuant to West Virginia Code, 5B–1–13b (1985). The revenue bonds would be used to finance the construction of improvements at Stonewall Jackson State Park in Lewis County, West Virginia. The respondent does not challenge the statutory method by which the bonds are to be issued, but instead raises the following substantive issues: (1) does the repayment mechanism for the park development revenue bonds violate Article X, Section 4, of the West Virginia Constitution, which restricts the State and its agencies from incurring debt; (2) can revenue bond proceeds be used to finance preconstruction project costs such as architectural and engineering studies; (3) are the revenue bonds issued for a public purpose; and (4) does the fact that the Division of Tourism and Parks is scheduled to be abolished in 1995 prohibit the issuance of the revenue bonds? We conclude that our answer to the first issue precludes the issuance of the bonds under the facts of this case.

I.

The Stonewall Jackson Lake State Park project began in 1977 as a joint venture between the State of West Virginia and the United States Corps of Engineers. The state and federal governments agreed to equally share project costs. As the project neared completion in 1990, the State owed approximately $15,000,000.00 which it could not afford to pay. Negotiations resulted in an amendment to the original contract with the Corps of Engineers which allowed the State to pay back its obligations on a dollar-for-dollar basis by constructing the proposed improvements contemplated by the bond issue in this case.

According to the Commissioner, the first phase of financing involves using the proceeds from a series of bank qualified park development revenue bonds totalling $6,000,000.00, which are at issue in this case. The bond proceeds will be used in the following manner: (1) $1,081,000.00 to pay for a marina which opened at the park on September 1, 1990; (2) $2,470,536.00 for architectural services and consulting fees; (3) $2,000,000.00 for golf course construction costs incurred prior to permanent financing; and (4) $448,464.00 for interest during construction and other costs.

The second phase of financing would involve the issuance of approximately $37,090,000.00 in park development refunding and revenue bonds. The Commissioner explains that proceeds from these bonds would fund the improvements contemplated by its contract with the Corps of Engineers. Of this amount, $3,594,000.00 will be capitalized construction interest, $3,081,000.00 will constitute a debt service fund for the first year's debt service, and $495,000.00 will pay costs of the bond issuance, leaving $29,921,000.00 as net construction proceeds.

According to the Commissioner, the park development bonds would be repaid solely from park system revenues, which totalled $17,092,786.00 for fiscal year 1994, $14,751,419.00 for fiscal year 1993, and $14,126,234.00 for fiscal year 1992. These revenues are deposited in an account separate from other funds allocated to the Division of Tourism and Parks and are not commingled with legislative appropriations that comprise part of the Division's annual budget. Earlier revenues have been used to repay bonds originally issued in 1969 at a rate of approximately $1,700,000.00 per year, and the last annual payment was made in November, 1994. Thus, according to the Commissioner, these park revenues will now be available to fund

1. Pursuant to an Administrative Order entered by this Court on September 13, 1994, retired Justice Thomas B. Miller was recalled for the September 1994 term because of the physical incapacity of Chief Justice W.T. Brotherton, Jr.

the repayment of the revenue bonds contemplated in this case.

The $6,000,000.00 in phase one financing described above is what is at issue in this proceeding. The Commissioner secured competitive bids from banks throughout West Virginia to purchase the park development revenue bonds. The proceeds from these bonds would provide funding for the initial phase of development. United National Bank was the lowest responsible bidder. The petitioner, Commissioner Lawrence, requested that Secretary Polan issue a purchase order for Requisition TAP 2148, which would provide the $6,000,000.00 in initial financing in the form of a line of credit for the Division of Tourism and Parks to draw on during the initial phase of development.

Secretary Polan refused to process the purchase order, expressing concern that the proposed park development revenue bonds may be illegal and unconstitutional. The Commissioner now seeks a determination of this issue by this Court and asks that we find that the respondent has a duty to process the purchase order set forth in Requisition TAP 2148.

## II.

The West Virginia Economic Development Act of 1985, W.Va.Code 5B–1–1 *et seq.*, provides the Commissioner with the general authority to issue revenue bonds to pay for the costs of state park development. West Virginia Code, 5B–1–13b, requires that these bonds be liquidated from a special fund.[2] This special fund is to be maintained by the revenues generated by the park development project, as set out in W.Va.Code, 5B–1–13h. In addition, W.Va.Code, 5B–1–13h, permits the Commissioner to pledge revenue "from any existing recreational facilities under his control, or any state park or forest, as additional security for the payment of any bonds issued under the provisions of this article to pay the cost of any park development project."[3] West Virginia Code, 5B–1–13e, contains a specific disclaimer which provides that "[t]he state of West Virginia shall not be liable on notes, security interests or bonds or other evidence of indebtedness of the Commissioner and such notes, security interests or bonds or other evidence of indebtedness shall not be a debt of the state of West Virginia...."[4] Moreover, W.Va.Code, 5B–1–13a, states that all revenue derived from the operation of the State park and public recreation system shall be expended to operate, maintain, and improve the system, or to retire park development revenue bonds.[5]

In several recent cases, we have discussed the scope of Article X, Section 4, of

**2.** The relevant portion of W.Va.Code, 5B–1–13b, states:

The commissioner, with the approval of the governor, is hereby empowered to raise the cost of any project, as defined hereinabove, by the issuance of park development revenue bonds of the state, the principal of and interest on which bonds shall be payable solely from the special fund herein provided for such payment.

Similar authority to issue revenue bonds was previously vested in the director of the state parks and recreation by W.Va.Code, 20–4–5 (1953).

**3.** West Virginia Code, 5B–1–13h (1985), states:

The commissioner, with the approval of the governor, shall have authority to pledge all revenue derived from any project as security for any bonds issued to defray the cost of such project. In any case in which the commissioner may deem it advisable, he shall also have the authority to pledge the revenue derived from any existing recreational facilities under his control, or any state park or forest, as additional security for the payment of any bonds issued under the provisions of this article to pay the cost of any park development project.

West Virginia Code, 5B–1–13 (1990), explains that all state parks and state recreational areas are within the jurisdiction and supervision of the section of parks and recreation.

**4.** The complete text of W.Va.Code, 5B–1–13e (1985), is:

The state of West Virginia shall not be liable on notes, security interests or bonds or other evidences of indebtedness of the commissioner and such notes, security interests or bonds or other evidence of indebtedness shall not be a debt of the state of West Virginia, and such notes, security interests or bonds or other evidence of indebtedness shall contain on the face thereof a statement to such effect.

**5.** West Virginia Code, 5B–1–13a (1985), states, in pertinent part:

All revenue derived from the operation of the state park and public recreation system shall be expended by the director solely for operating, maintaining and improving the system, or for the retirement of park development revenue bonds.

the West Virginia Constitution as it relates to the ability of the State or its agencies to issue revenue bonds.[6] There is no need to trace the historical origins of Article X, Section 4, at this time or to review prior cases in which we addressed this section. These matters were discussed in some detail in *Winkler v. State School Bldg. Authority,* 189 W.Va. 748, 434 S.E.2d 420 (1993), where we summarized our conclusions in syllabus points 4 and 6:

> 4. The restrictions contained in Section 4 of Article X of the West Virginia Constitution deal with the creation of long-term debt by the State or its agencies by way of legislative enactments through revenue bonds or other similar obligations.
>
> 6. Section 4 of Article X of the West Virginia Constitution is not designed to prohibit the State or the state's agencies from issuing revenue bonds that are to be liquidated from contracts requiring rental payments from another state agency or from contracts for necessary services such as utilities; nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund.

*See also* syllabus point 1, *State ex rel. Marockie v. Wagoner,* 191 W.Va. 458, 446 S.E.2d 680 (1994).

■ Following *Winkler,* we made the scope of Article X, Section 4, more explicit in *State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 438 S.E.2d 810 (1993), by stating in syllabus point 3:

> If the Legislature creates a new tax source or increases the amount to be paid on an existing tax account, this new or increased amount may be used to liquidate revenue bonds. The Legislature may also utilize an existing special revenue source to

liquidate revenue bonds so long as that source of funds has not gone into the general revenue fund. In these situations, the financial integrity of the State's existing tax structure has not been impaired because there is a new revenue source to liquidate the bonds. Thus, the bonds do not represent an increased burden on the State's existing indebtedness in violation of Section 4 of Article X of the West Virginia Constitution.

■ Admittedly, from a superficial examination of the parks and recreation bond statute, it would appear to pass constitutional muster since there is a special fund to liquidate the bonds. As earlier pointed out, W.Va.Code, 5B–1–13b, refers to a special fund to liquidate park and revenue bonds.[7] The source of such special funds are the revenues generated in the park system as spelled out in W.Va.Code, 5B–1–13h.[8]

However, the Commissioner's factual disclosures demonstrates that in fiscal year 1992, the park system[9] generated slightly over $14 million in revenue but had expenditures of $21.5 million, leaving a deficit of approximately $7 million dollars. In fiscal 1993, revenues were slightly higher at $14.9 million, but expenditures were at $21.5 million, leaving a deficit of $6.5 million. In 1994, revenues were at $16.5 million, but expenditures were slightly over $23 million, with a deficit of $6.7 million. These figures reveal that there are no net revenues that could be used to liquidate revenue bonds. The deficit in the park system is made up from appropriations from the general revenue fund. Thus, the only real source of funds that can be used to liquidate the bonds are those derived from the general revenue fund.[10]

In *Winkler, supra,* the argument was advanced that the revenue bond statute in-

---

6. Article X, Section 4, of the West Virginia Constitution provides:

> No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years.

7. This portion of the text of W.Va.Code, 5B–1–13b, is contained in note 2, *supra.*

8. The text of W.Va.Code, 5B–1–13h, is contained in note 3, *supra.*

9. There are fifty-three parks and related facilities in the State Park System.

10. In the Division of Tourism and Parks Annual Appropriation schedules furnished to this Court, the Legislature has furnished over $22 million from the general revenue fund in fiscal year 1992. A similar amount was furnished in fiscal years 1993 and 1994. In oral argument, it was explained that part of these funds went to the

volved W.Va.Code, 18–9D–14, specifically provided that neither the credit of the State nor its taxing power could be utilized to redeem the revenue bonds. Moreover, the bond form contained a statement that revenues to retire the bond were subject to annual appropriation by the Legislature but that it was not "legally obligated to make appropriations in amounts sufficient to pay debt service on the bonds." 189 W.Va. at 753, 434 S.E.2d at 425. Consequently, we were asked to approve the bonds as not being a debt of state under Article X, Section 4 of the West Virginia Constitution. We rejected this argument by stating:

> Finally, unless we are to abandon our logic and common sense, we cannot help but conclude that the statutory scheme surrounding these bonds bespeaks a legislative requirement that they be funded.... Even if we were to close our eyes to this statutory language, we could not close our minds to the practical consequences of this revenue arrangement. To accept the premise that the Legislature is not bound to fund the bonds and would allow a default, thereby impairing the credit rating of the State, assumes a naivete on our part that we simply do not possess.

189 W.Va. at 763, 434 S.E.2d at 435.

Much the same result occurs in this case. Even though W.Va.Code, 5B–1–13e,[11] states that the revenue bonds are not an obligation of the state, there is in fact no other way that they will be liquidated except from the state's general revenue fund. This is how the deficit in the park system is eliminated. There are no surplus revenues from the park system to go into a special funds for the bonds. The petitioners do not point to any other source of funds.[12] It would defy logic and common sense if we were to permit some of the gross revenues from the park system to be placed in a special fund to liquidate the bonds. This would only increase the overall deficit that would have to be satisfied from the general revenue fund.

■ Thus, we conclude that W.Va.Code, 5B–1–13b, authorizes the Commissioner of Tourism and Parks to issue revenue bonds which are to be liquidated from a special fund derived from revenues from the park recreational facilities. However, such revenue bonds will violate Article X, Section 4 of West the Virginia Constitution, where the park facilities operate at a net deficit and the only source of funds to liquidate the bonds is the general revenue fund of the Legislature.

■ The other issues raised by the respondent are without merit. Park revenue bonds can be used to pay pre-construction project costs such as architectural and engineering fees as well as legal fees. This is specifically authorized in W.Va.Code, 5B–1–13a, which defines "cost of project" for bond purposes.[13] Park revenue bonds in this case are obviously used for a public purpose since they fund the building of a public recreational facility. The public purpose of the state park system was stated by the Legislature in W.Va.Code, 5B–1–13c.[14] Moreover, courts have recognized that a public purpose use of revenue bond financing includes public parks. See e.g., *Hucks v. Riley*, 292 S.C. 492, 357 S.E.2d 458 (1987); *In re Opinion of the*

---

Tourism sections. However, no detailed separation could be given.

**11.** The text of W.Va.Code, 5B–1–13e, is found in note 4, *supra*.

**12.** We note that on the appropriation schedules, the Division of Tourism and Parks has in the last three fiscal years received over $11 million dollars annually from the Lottery Commission. This is pursuant to W.Va.Code, 29–22–18(a), which provides that the profits from the West Virginia Lottery are not to be treated as a part of the general revenue fund. It was this source of special funds that we approved to liquidate the school revenue bonds in *State ex rel. Marockie v. Gainer*, 191 W.Va. 458, 446 S.E.2d 680 (1994).

**13.** " 'Cost of Project' shall embrace the cost of construction, the cost of all land, property, material and labor which are deemed essential thereto, cost of improvements, financing charges, interest during construction, and all other expenses, including legal fees, trustees', engineers' and architects' fees which are necessary or properly incidental to the project." The term "cost of project" is used in W.Va.Code, 5B–1–13b, which authorizes the use of park revenue "to raise the cost of any project as defined hereinabove."

**14.** West Virginia Code, 5B–1–13c, provides:

> The exercise of the powers granted to the commissioner herein will be in all respects for the benefit of the people of the state, for the improvement of their health, safety, conve-

*Justices,* 103 N.H. 262, 169 A.2d 637 (1961); *Kentucky Lake Vacation Land, Inc. v. State Property and Bldgs. Commission,* 333 S.W.2d 779 (Ky.1960); *Watson v. Larson,* 159 Fla. 860, 33 So.2d 155 (1947); *King v. Sheppard,* 157 S.W.2d 682 (Tex.Civ.App. 1941).

■ The fact that W.Va.Code 5B–1–12(a) (1994),[15] states that the Park system will be transferred to the Division of Natural Resources on January 1, 1995, and the office of the Commissioner of Tourism and Parks will cease to exist as of July 1, 1995, does not mean its existing contracts will be abolished. W.Va.Code, 5B–1–12(d) (1994), specifically provides that "no funds may be transferred from a special revenue account, dedicated account, capital expenditure account or any other dedicated account or fund for any use or purpose other than the purpose for which the account or fund is dedicated: ...."[16]

■ We have traditionally held that mandamus will lie against a public official where it is shown that he has a legal obligation to act but refuses to do so, as explained in syllabus point 10 of *State ex rel. Marockie v. Wagoner,* 191 W.Va. 458, 446 S.E.2d 680 (1994):

"A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl.

pt. 2, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969).

■ Moreover, we have commonly recognized that a writ of mandamus is a proper method of testing the legality of a bond issue before the bonds are actually issued. This was pointed out in Note 1 of *State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 469, 438 S.E.2d 810, 812 (1993).

This type of proceeding has been the traditional format for this Court to pass on the constitutionality of state bonds in advance of their issuance. See, e.g., *State ex rel. Dep't of Employment Security v. Manchin,* 178 W.Va. 509, 361 S.E.2d 474 (1987); *State ex rel. Ohio County Comm'n v. Samol,* 165 W.Va. 714, 275 S.E.2d 2 (1980).

Here, as a result of our finding that the funding mechanism for repayment of the park revenue bonds violates Article X, Section 4 of our Constitution, there is no duty on the part of the respondent Polan to act. Therefore, there is no basis for issuing a writ of mandamus. Consequently, the writ is denied.

Writ denied.

BROTHERTON, C.J., did not participate.

MILLER, RETIRED J., sitting by temporary assignment.

---

nience and welfare and for the enhancement of their recreational opportunities and *is a public purpose.* (Emphasis added).

15. W.Va.Code, 5B–1–12(a) (1994), provides:

The division of tourism and parks and the office of commissioner of tourism and parks is hereby abolished effective the first day of July, one thousand nine hundred ninety-five. Not later than the first day of January, one thousand nine hundred ninety-five, the sections and functions of the division of tourism and parks related to state parks, state recreation areas and wildlife recreation areas shall be transferred to the division of natural resources and all sections and functions of the division of tourism and parks related to tourism shall be transferred to the West Virginia development office.

16. The relevant portion of W.Va.Code, 5B–1–12(d) (1994), is:

Upon transfers as authorized in subsection (a) of this section, the governor may transfer the funds appropriated to the section transferred or attributable to the function transferred in order to implement the transfer: Provided, That the authority to transfer funds under this section shall expire on the thirtieth day of June, one thousand nine hundred ninety-five: Provided, however, That no funds may be transferred from a special revenue account, dedicated account, capital expenditure account or any other dedicated account or fund for any use or purpose other than the purpose for which the account or fund is dedicated: Provided further, That nothing herein shall be construed to prohibit the expenditure of lottery proceeds for those purposes specifically authorized in subsection (i), section eighteen [§ 5B–22–18(i)], article twenty-two of this code. [The reference to W.Va.Code, 5B–22–18(i) is an error; it should be W.Va.Code, 29–22–18(i) (1990)].